[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-14600

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 21, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-22677-CV-DLG

MIGUEL V. RODRIGUEZ,

Plaintiff-Appellant,

versus

SECRETARY FOR THE DEPARTMENT OF CORRECTIONS,
James McDonough,
EVERGLADES CORRECTIONAL INSTITUTION,
R. PENDLETON,
Assistant Warden,
NADRIAN BRINSON,
Correction Officer a.k.a. Brinston,
EDNA FIGUEROA,
a.k.a. Figueroa, Correction Officer, et al.,

Defendants-Appellees.

_____

No. 05-14842

_____

D. C. Docket No. 02-22677-CV-DLG

MIGUEL V. RODRIGUEZ,

Plaintiff-Appellant,

versus

SECRETARY FOR THE DEPARTMENT OF CORRECTIONS, et al.,

Defendants,

R. KUGLER,
Assistant Warden,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(November 21, 2007)**

Before ANDERSON, MARCUS and COX, Circuit Judges.

ANDERSON, Circuit Judge:

2

Appellant Miguel V. Rodriguez, a Florida prisoner, filed this §1983 suit against two prison officials, Appellees Raymond Kugler and Charles Johnson, alleging that they violated his Eighth Amendment right to be free from cruel and unusual punishment.[1]  Specifically, Rodriguez says that while he was being held in administrative segregation he informed Kugler and Johnson that members of his former gang had threatened to kill him upon his release into the general prison population.  He therefore asked Kugler and Johnson to place him in protective custody or, alternatively, to transfer him from the prison.  Rodriguez says that despite being confronted with the information of the death threats and his requests for protection, Kugler and Johnson recommended that he be released into the general population.  Mere hours after reentering the general population, Rodriguez was violently assaulted — stabbed in the back and chest with a shank — by Arnold Cleveland, a member of the Latin Kings.  Rodriguez says that Kugler's and Johnson's failure to take reasonable steps aimed at preventing the attack, the threat of which each was subjectively aware, violated the Eighth Amendment under Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994).

---

[1] Rodriguez originally sued a total of five prison officials, but only Kugler and Johnson are before us in this appeal.   In his complaint, Rodriguez also pursued tort claims against Kugler and Johnson under Florida law.  The district court rejected the Florida-law claims, and Rodriguez does not challenge that ruling on appeal.

Following discovery, the district court granted summary judgment to Kugler, holding that Rodriguez's complaints about the threats to his life did not contain "specific facts" sufficient to show that Kugler had subjective knowledge of the risk. In reaching this determination, the district court relied exclusively on our decision in Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003).

Rodriguez's claim against Johnson went to trial. After Rodriguez presented his case in chief, Johnson moved for judgment as a matter of law. The district court granted Johnson's motion, holding that he did not cause the Eighth Amendment violation because he did not have the final authority to order Rodriguez's release into the general prison population.

Rodriguez appeals both rulings. After oral argument and a thorough review of the record, we vacate the judgment of the district court with respect to both Kugler and Johnson and remand both claims for further proceedings.

With respect to Kugler, we conclude that: (1) there are genuine issues of material fact regarding whether he was subjectively aware that Rodriguez faced a substantial risk of serious harm; (2) this appeal does not require us to address the reasonableness of Kugler's response to the risk of harm facing Rodriguez; and (3) there is evidence in the summary-judgment record from which a reasonable juror could find a causal connection between Kugler's actions and the Eighth

4

Amendment violation.

With respect to Johnson, we conclude that: (1) a reasonable juror could find, based on the evidence presented at trial, that Johnson was subjectively aware that Rodriguez faced a substantial risk of serious harm; (2) this appeal does not require us to address the reasonableness of Johnson's response to the risk of harm facing Rodriguez; and (3) a reasonable juror could find, based on the evidence presented at trial, a causal connection between Johnson's actions and the Eighth Amendment violation.

## I. FACTS

These are the facts taken in the light most favorable to Rodriguez, construing all reasonable inferences in his favor.[2] In 2002, Rodriguez was an inmate at the Everglades Correctional Institution (ECI) in Miami, Florida. Raymond Kugler was the Assistant Warden for Operations at ECI and, in that capacity, shared responsibility for prison security. Charles Johnson was the Colonel of ECI and was, in that capacity, the chief of prison security.

During the winter of 2002, Rodriguez was under "close management," which in ECI parlance means that he was segregated from the general prison

---

[2] Because Rodriguez may not be able to prove such reasonable inferences to the satisfaction of the jury, the facts we recite may ultimately turn out not to reflect the true facts of the case.

population[3] for security purposes. Rodriguez had been in close management since January 2001 because of an ongoing investigation of gang activity at ECI and because he had assaulted a fellow inmate while in the compound. On at least one previous occasion, Rodriguez had been placed in close management in response to his request that the prison provide him protection.

While under close management in early 2002, Rodriguez "learned that gang members at ECI wanted to kill [him]." Pl.'s Decl. ¶4. Those who wanted to kill him were members of his former gang, the Latin Kings, which had a particularly strong presence at ECI. They wanted to kill Rodriguez as retribution for his having renounced his membership. On at least two occasions while under close management, Rodriguez verbally told Kugler "of the threat made against my life" by members of his former gang and "asked [Kugler] that I be transferred to another correctional institution for my protection." Id. ¶5. Rodriguez's transfer request was "in addition to requesting that [I] be placed in protective custody."[4] Id. Kugler took no action with respect Rodriguez's allegations or his requests for protection.

Rodriguez also spoke to Johnson on a number of occasions regarding the

---

[3] The general prison population at ECI is known as "the compound."

[4] Kugler says he does not recall having any conversations with Rodriguez.

threats on his life. According to his trial testimony, Rodriguez, beginning in March 2002, told Johnson "[t]hat I was afraid for my life and that I didn't want to go out to the compound and that he should give me protection and give me a transfer" from ECI. Trial Tr. I at 104-05. Rodriguez specifically informed Johnson that his life had been threatened by members of the Latin Kings. Rodriguez explained to Johnson why he was scared of the Latin King members at ECI, stating that "they would shout at me, telling me that they were going to kill me." Id. at 139. One of Rodriguez's fellow inmates, Antania Tyrone Flowers, testified at trial to a conversation that he overheard between Rodriguez and Johnson. In that conversation, Rodriguez asked Johnson for protection from the gang members in the compound and, specifically, that he be transferred to another prison. According to Flowers, Johnson responded that "he was going to look into it and . . . get with the classification officer . . . , and he'd let [Rodriguez] know what they [were] going to do about that." Trial Tr. II at 201. Johnson, however, did not "look into" anything, did not "get with" anyone, and did not otherwise tell anyone about Rodriguez's safety concerns. Nor did he act on those concerns himself, something he was authorized to do.

In addition to verbally expressing his security concerns to Kugler and Johnson, Rodriguez also filed with ECI a written form, known as an Inmate

7

Request form, dated February 18, 2002, in which he stated: "I have a problem with another inmate in this compound. I want you to tell me my status here where I am. I submitted a request for protection. I want to know . . . whether you are going to give me a transfer." The February 18 Inmate Request form, submitted while Rodriguez was still under close management, was addressed to both the "Warden" and the "Asst. Warden."[5] Id. Rodriguez received a response from someone at ECI, communicated on the bottom of the Inmate Request form itself, before the attack occurred. ECI's response acknowledged an ongoing investigation into gang activity among the prison population.

Submitting an Inmate Request form is not the only way a prisoner at ECI may bring a security concern to the attention of the appropriate officials. Johnson, who (like Kugler) had frequent face-to-face contact with inmates at ECI, testified in his deposition that inmates may also bring their security concerns directly to ECI officials through informal conversation. ECI officials knew what to do when faced with such concerns because ECI had in place an established protocol for

---

[5] As the Assistant Warden for Operations, including security, Kugler concedes that he would ordinarily have received a security-related Inmate Request form like Rodriguez's. Kugler Dep. at 30-31. He denies, however, having seen the Inmate Request form submitted by Rodriguez any time prior to this lawsuit. Id. at 29. As the Colonel of ECI, and thus the chief of security, Johnson likewise concedes that "if it [an Inmate Request form] addressed a security concern, [the prison employee who translated it] would have forwarded it to me." Johnson Dep. at 66. Like Kugler, Johnson denies that he ever saw Rodriguez's Inmate Request form prior to this lawsuit. Id. at 66-67.

dealing with situations in which a prisoner reports that he fears his life is in jeopardy. According to Johnson, the protocol is triggered as follows:

> [If an inmate] comes to me and state[s] that he is in fear for his life, I am going to make him stand right there and I'm going to call the shift supervisor and explain to the shift supervisor, "This inmate stated he's in fear for his life, please place him in administrative confinement until we do a protective management review."

Johnson Dep. at 24.

Johnson explained that a "protective management review" entails having a sergeant "go and investigate" the inmate's claims. Such a review requires that the sergeant "get all the statements from everybody" that the inmate says he is having trouble with. Id. Once that process is complete, according to Johnson, if the prisoner's safety concerns are substantiated, the appropriate prison officials "get[] together and we normally recommend he [the complaining inmate] be transferred from the institution." Id. at 25.[6] No protective management review was ever initiated in response to the safety concerns expressed by Rodriguez.

On April 3, 2002, a Classification Review meeting was held to determine whether Rodriguez was ready to be released from close management back into the

---

[6] Johnson's deposition, as well as Kugler's, was before the court for purposes of the Kugler summary judgment. Although Johnson's deposition was not introduced into evidence at the trial of Rodriguez' claim against Johnson, the same evidence with respect to the protective management protocol was introduced at the trial, primarily in the form of the portions of Kugler's deposition which were read to the jury.

general population. Such meetings are convened periodically for inmates under close management, and there is nothing in the record to indicate that the April 3 meeting was scheduled in response to Rodriguez's complaints. Present at this meeting were Rodriguez, Kugler, Johnson, and a classification officer. Kugler and Johnson, along with the classification officer, formed a three-person team tasked with the responsibility of making a recommendation to another group of individuals — a "classification team" — regarding an inmate's suitability for release from close management. The classification team was the body empowered to make final decisions about whether to release an inmate from close management. Neither Kugler nor Johnson had final authority (either individually or jointly) to order Rodriguez's release from close management. They do not, however, dispute that either one of them could have recommended to the classification team that Rodriguez be held in protective custody while the threats on his life were investigated — e.g., by a "protective management review" — or that he be transferred to another institution. Nor do they dispute the fact that each of them had independent authority to initiate a protective management review. Instead of pursuing any of these alternatives, Kugler and Johnson ignored Rodriguez's repeated requests for protection and recommended to the classification team that he be released into the compound.

During the April 3 meeting, Rodriguez again told Kugler that he believed his life was in danger and requested that he be transferred to another institution for protection.[7] Pl.'s Decl. ¶9. Kugler ignored Rodriguez's request and told him that he was being recommended for release to the compound and that "he had to make any request for transfer from the compound."[8] Id. During the meeting, Kugler told Rodriguez that if he did not comply with the order to return to the compound, Kugler would "give [him] a disciplinary report and continue him on CM status."[9] Id. ¶10. At the conclusion of the April 3 meeting, Rodriguez was recommended for release from close management and was released six days later on April 9 at 6:00 p.m.

On the morning of April 10, 2002, only hours after having been transferred to the compound, Rodriguez was stabbed in the back and chest with a shank by Arnold Cleveland, an "enforcer"[10] of the Latin Kings.

---

[7] Kugler denies that Rodriguez raised any security-related concerns at the April 3 meeting.

[8] Kugler denies this.

[9] Kugler denies this.

[10] The role of an "enforcer" is to exact physical retribution on those who repudiate their gang membership.

11

## II.  STANDARDS OF REVIEW

We review de novo a district court's grant of summary judgment, applying the same standard that bound the district court and viewing the evidence and all reasonable inferences in the light most favorable to Rodriguez.  See Drago v. Jenne, 453 F.3d 1301, 1305 (11th Cir. 2006).  "Summary judgment is appropriate when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'"  Id. (quoting Fed.R.Civ.P. 56(c)).

We review de novo a district court's grant of judgment as a matter of law under Fed.R.Civ.P. 50(a), applying the same standard that bound the district court.  Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1114 (11th Cir. 2005).  That standard requires that we examine the evidence presented at trial in the light most favorable to Rodriguez.  Id.  The district court's entry of judgment as a matter of law in favor of Johnson was proper only if "'there [was] no legally sufficient evidentiary basis for a reasonable juror to find for [Rodriguez]'" on his Eighth Amendment claim.  Id. (quoting Fed.R.Civ.P. 50(a)).[11]

---

[11]    Neither Kugler nor Johnson argues on appeal that he is shielded from suit by qualified immunity.  We therefore express no view on the application of qualified-immunity principles to these facts.

# III. DISCUSSION

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833, 114 S. Ct. at 1976 (citing various courts of appeals); see Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected . . . from physical assault by other inmates."). "[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." Farmer, 511 U.S at 833, 114 S. Ct. at 1977.

A prison official violates the Eighth Amendment when he actually (subjectively) knows that an inmate is facing a substantial[12] risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively)

---

[12]     Because the Court's task in Farmer was only "to define the term 'deliberate indifference,'" the Court expressly declined to address "at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes." 511 U.S. at 829, 834 n.3, 114 S. Ct. at 1974, 1977 n.3 (emphasis added). Neither Kugler nor Johnson argues that the risk of harm facing Rodriguez was insufficiently substantial for Eighth Amendment purposes. In the context of this case, we conclude that the gang-related threats made on Rodriguez's life, which were explicitly reported to prison officials, present a substantial enough risk of harm to trigger a prison official's Eighth Amendment duty to act; that is, to take some steps to investigate the likelihood that the reported threat will materialize and to take some steps aimed at reducing the likelihood of the risk. See e.g., Odom v. South Carolina Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (concluding that an inmate-on-inmate assault resulting in "significant physical injury," preceded by reported death threats, was sufficiently substantial for Eighth Amendment purposes).

13

reasonable manner. See Farmer, 511 U.S. at 829, 837, 844, 114 S. Ct. at 1974, 1979, 1982-83; see also Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003); Hale v. Tallapoosa County, 50 F.3d 1579, 1582-83 (11th Cir. 1995). As with any other claim brought under § 1983, to succeed, the inmate must demonstrate a causal connection between the prison official's conduct and the Eighth Amendment violation. See Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982); see also LaMarca v. Turner, 995 F.2d 1526 (11th Cir. 1993).

With regard to the subjective component of the Eighth Amendment claim, the Court in Farmer held that the prison "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837, 114 S. Ct. at 1979. The Court also held: "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Id. at 842, 114 S. Ct. at 1981 (emphasis added). A prison official cannot avoid liability under the Eighth Amendment "by showing that . . . he did not know the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." Id. at 843, 114 S. Ct. at 1982 (emphasis added). This is because "[t]he question under the Eighth Amendment is whether prison officials, acting with

14

deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" Id. (quoting Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 2481 (1993)).

The Court in Farmer identified three ways that prison officials might avoid Eighth Amendment liability. Officials might show: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger"; (2) "that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844, 114 S. Ct. at 1982-83.

Kugler and Johnson make two arguments on appeal. First, they maintain that they did not know any "facts indicating a sufficiently substantial danger" and thus did not actually know that Rodriguez faced a substantial risk of serious harm. Their argument in this regard, stated differently, is that the concerns expressed by Rodriguez were not specific enough to put them on actual notice of a risk of harm. Second, they maintain that Rodriguez cannot demonstrate the requisite causal connection because they did not, in their capacity at the April 3 meeting, have final authority to order Rodriguez's release from close management. All they

could do at that meeting was <u>recommend</u> Rodriguez's release to the compound, and this, they say, is not sufficient to support a finding that their actions caused his subsequent injury.[13]

A.     <u>Summary Judgment to Kugler</u>

1.     Did Kugler Actually Know Rodriguez Faced a Substantial Risk of Serious Harm?

The district court determined that Rodriguez could not satisfy the subjective component of his Eighth Amendment claim and granted summary judgment to Kugler solely on this basis.[14]  Rodriguez argues that the district court erred in granting summary judgment to Kugler because there is evidence in the record from which a reasonable juror could find that Kugler actually knew that Rodriguez faced a substantial risk of serious harm from his former gang members. Specifically, Rodriguez says, the summary-judgment record viewed in the light most favorable to him demonstrates that: (1) he verbally informed Kugler on at least two occasions that his life had been threatened by members of his former gang and that, to avoid injury, he needed either to be transferred to another prison

_____

[13]     Kugler and Johnson do not argue that they "knew the underlying facts but believed (albeit unsoundly) that the risk . . . was insubstantial or nonexistent."  Nor do they argue that they "responded reasonably to the risk."  And, as noted above, they do not argue qualified immunity, i.e., that they have not violated clearly established law.

[14]     The district court did not address the objective component of Rodriguez's claim — i.e., whether Kugler responded to the risk of harm in an objectively reasonable manner.

16

or to be placed in protective custody at ECI; and that (2) he, by means of the written Inmate Request form, informed Kugler that he feared for his safety in the compound and requested a transfer from ECI. This, Rodriguez says, is enough evidence of subjective knowledge to get his claim to a jury. We agree.

Rodriguez submitted a declaration in opposition to Kugler's summary-judgment motion in which he stated that "While in Close Management ("CM") at ECI prior to the April 10, 2002 stabbing incident, I learned that gang members at ECI wanted to kill me." Pl.'s Decl. ¶4. Viewed in the light most favorable to Rodriguez, this evidence gives rise to an inference that he received threats on his life, from members of his former gang, prior to the stabbing. Rodriguez stated in his declaration that "verbally on at least two separate occasions [prior to the April 10 stabbing]" "I informed [Kugler] . . . of the threat made against my life and asked that I be transferred to another correctional institution for my protection." Id. ¶5 (emphasis added). Again, viewed in the light most favorable to Rodriguez, the reasonable inference created by this evidence is that the threat of which Rodriguez twice informed Kugler was the gang-related threat referenced in the preceding paragraph of his declaration, the threat we can infer from Rodriguez's knowledge that "gang members at ECI wanted to kill [him]." We think that this evidence is sufficient to create a genuine issue of material fact regarding whether

17

Rodriguez, on at least two occasions, told Kugler that he feared a gang member might kill him and thus requested either a transfer from ECI or placement in protective custody.

With regard to Rodriguez's verbal complaints, Kugler said in his deposition that he did not remember having any conversation with Rodriguez in which Rodriguez mentioned the threats to his life or his need for a transfer or protective custody. Kugler's denial flatly contradicts Rodriguez's allegations. Besides denying that such conversations ever took place, Kugler also challenges the sufficiency of Rodriguez's declaration on the ground that it does not "furnish any specifics as to who was posing the alleged threats." Appellees' Br. at 6 (emphasis added). Kugler's challenge to the declaration in this respect is without merit, however, as confirmed by the Supreme Court in Farmer: "Nor may a prison official escape liability for deliberate indifference by showing that . . . he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." 511 U.S. at 843, 114 S. Ct. at 1982 (emphasis added). We conclude that Rodriguez's declaration testimony, coupled with Kugler's inability to recall any security-related conversations with Rodriguez, is sufficient to create a genuine issue of material fact about whether Kugler had subjective knowledge that Rodriguez faced a substantial risk of serious

18

harm.

With regard to the submission of Rodriguez's February 18, 2002, Inmate Request Form – in which he stated that he had "a problem with another inmate in this compound," that he had "submitted a request for protection," and that he "want[ed] to know . . . whether you are going to give me a transfer" – Kugler testified in his deposition that, although he would ordinarily have received a security-related Inmate Request form like Rodriguez's, he never saw the one submitted by Rodriguez. Kugler's testimony that he would ordinarily have received such a form, coupled with his express denial that he received the one submitted on February 18, leads us to conclude that there is a genuine issue of material fact about whether Kugler was aware of the Inmate Request form prior to the attack. This dispute of fact, in turn, is relevant to the question whether Kugler had subjective knowledge that Rodriguez faced a substantial risk of serious harm.[15]

---

[15] Standing alone, the dispute over whether Kugler received the Inmate Request form probably would not suffice to create a genuine issue of fact about Kugler's subjective knowledge of a substantial risk of serious harm and thus would not have precluded summary judgment in Kugler's favor. That is because, even if Kugler did receive it, the form does not contain much about the nature of the anticipated risk. Rather, it vaguely states that "I have a problem with another inmate in this compound" and "[have made a] request for protection." But when the information contained in the form is considered in conjunction with Rodriguez's declaration testimony that he verbally informed Kugler at least twice of the gang-related threats to his life, then Kugler's denial about receiving the Inmate Request form becomes more important to the inquiry of Kugler's subjective knowledge.

## 2. Did Kugler Respond Reasonably to the Known Risk?

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844, 114 S. Ct. at 1982-83. More succinctly, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Id. at 845, 114 S. Ct. at 1983. We have said that a prison official violates the Eighth Amendment if he responds to a known risk "in an objectively unreasonable manner." Cottone, 326 F.3d at 1358. An official responds to a known risk in an objectively unreasonable manner if "he knew of ways to reduce the harm but knowingly declined to act" or if "he knew of ways to reduce the harm but recklessly declined to act." Hale, 50 F.3d at 1583.

Rodriguez argues on appeal that Kugler responded to the threatened risk of harm in an objectively unreasonable manner. But the district court, given that it granted summary judgment to Kugler solely on the basis that Kugler lacked subjective knowledge of the risk, stopped short of addressing this question. Moreover, Kugler does not argue on appeal that his response was reasonable; rather, Kugler argues only that he had no subjective knowledge of a substantial risk of harm, and/or that he was not the cause. Because it is not necessary for us to

do so, we decline to address the objective component of Rodriguez's Eighth Amendment claim. We accordingly leave to the district court on remand the task of considering this issue in the first instance.

### 3. Did Kugler Cause Rodriguez's Injury?

In granting summary judgment to Kugler, the district court did not consider whether Kugler caused the Eighth Amendment violation. The court did not need to consider that question because it determined that there was not enough evidence to show that Kugler actually knew about the substantial risk of serious harm facing Rodriguez. On appeal, however, Kugler asks us to affirm the district court's judgment on the ground that he did not cause the violation. For the reasons stated below with respect to Johnson, we reject Kugler's argument because the record contains evidence from which a reasonable juror could find a causal connection between Kugler's actions and the Eighth Amendment violation.

## B. Judgment as a Matter of Law to Johnson

### 1. Did Johnson Actually Know Rodriguez Faced a Substantial Risk of Harm?

Johnson argues that he did not actually know that Rodriguez faced a substantial risk of serious harm. Johnson says that Rodriguez's complaints were too vague to trigger his Eighth Amendment duty to act. The evidence Rodriguez

presented at trial, however, tells a different story.  That evidence is sufficient to permit a reasonable juror to find that Johnson actually knew that Rodriguez faced a substantial risk of serious harm.  We thus reject Johnson's argument to the contrary.[16]

Rodriguez testified at trial that he first spoke with Johnson about his fear of being released into the compound on March 28.  On that date, Rodriguez told Johnson "[t]hat I was afraid for my life and that I didn't want to go out to the compound and that he should give me protection and give me a transfer" to another institution.  Trial Tr. I at 104-105.  Rodriguez spoke to Johnson again at the April 3 Classification Review meeting.  At that meeting Rodriguez "told the colonel that I didn't want to be released to the compound because . . . I was afraid that other inmates would attack me, that I wanted for him to give me a protection and a transfer."  Id. at 105.  On at least one occasion, Rodriguez specifically told Johnson that some member or members of the Latin Kings had issued a death threat against him.  Id. at 123.  Rodriguez "told him [Johnson] that I was a . . . retired gang member and that the Latin Kings wanted to attack me because I didn't

---

[16] The district court's grant of judgment as a matter of law to Johnson was not based on a conclusion that the evidence presented at trial was insufficient to demonstrate subjective knowledge of a substantial risk of serious harm.  But Johnson does make this argument on appeal as an alternative basis for affirming the judgment as a matter of law entered in his favor.

22

want to continue being a Latin King, and that that was one of the reasons why I wanted protection at Everglades, because there were an excess amount of members of that gang in there." Id. Rodriguez told Johnson that "all the members were sending me messages . . . [and] [w]hen I went past, they would shout at me, telling me they were going to kill me." Id. at 139.

Johnson argues that no reasonable juror could conclude from this evidence that Rodriguez communicated to Johnson "specific facts from which an inference could be drawn that a substantial risk of serious harm exists." Appellees' Br. at 17. We disagree.

Johnson relies exclusively on our decision in Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003), to support his argument that Rodriguez's complaints were too vague to put Johnson on actual notice of a substantial risk of harm. Carter does not help Johnson. In Carter an inmate was stabbed with a shank by a fellow inmate with whom he had been placed. The inmate then sued various prison officials under the Eighth Amendment for failing to prevent the stabbing, arguing that he had made the officials sufficiently aware of the risk of harm, yet they failed to act. We rejected the inmate's claims on the ground that the comments he made to the officials were too vague to show that the officials had "actual knowledge" of a substantial risk of serious harm. Id. at 1350. Specifically, we noted that the

23

only complaints the inmate made to prison officials were that the attacker-inmate (1) paced his cell like a wild animal, (2) wanted to fake a hanging in order to secure a transfer, and (3) told the plaintiff-inmate that he would help the attacker-inmate carry out the fake hanging "one way or another." Id. at 1349. In rejecting his Eighth Amendment claims, we expressly relied upon the fact that the inmate never told prison officials that he "feared" his attacker, never told them that he had been "clearly threatened," and never asked to be placed in "protective custody." Id. at 1349, 1350. In short, we concluded: "Plaintiff has failed to establish that either Defendant had a subjective awareness of a substantial risk of serious physical threat to Plaintiff." Id. at 1350. Carter is thus easily distinguishable on its facts.

Here, unlike in Carter, Rodriguez told Johnson the following specific information: (1) that he was a former Latin King who decided to renounce his membership; (2) that members of the Latin Kings had threatened to kill him when he returned to the compound in retaliation for his renunciation; (3) that the compound at ECI was heavily populated with Latin Kings; and (4) that, in order to prevent an attempt on his life, he needed either to be transferred to another institution or to be placed in protective custody. These are the things that the

24

inmate in Carter did not do.[17]  A reasonable juror could find from this evidence that Johnson actually knew that Rodriguez faced a substantial risk of serious harm.

Accordingly, we conclude that there was a "legally sufficient evidentiary basis for a reasonable juror to find for [Rodriguez]" on the subjective component of his Eighth Amendment claim.  Fed.R.Civ.P. 50(a).

### 2.  Did Johnson Respond Reasonably to the Known Risk?

As he did with respect to Kugler, Rodriguez argues on appeal that Johnson responded to the threatened risk of harm in an objectively unreasonable manner. But (as in the case of Kugler) the district court did not address this question, given that it granted judgment as a matter of law to Johnson solely on the basis that Johnson did not cause the Eighth Amendment violation.  Moreover, Johnson does not argue on appeal that his response was reasonable.  Because it is not necessary for us to do so, we decline to address the objective component of Rodriguez's Eighth Amendment claim.  We accordingly leave to the district court on remand the task of considering this issue in the first instance.

---

[17]  Kugler's (and the district court's) reliance on Carter is similarly misplaced. Rodriguez on at least two separate occasions told Kugler that gang members had made threats on his life and requested that Kugler place him in protective custody or recommend that he be transferred from ECI.

3. Did Johnson Cause Rodriguez's Injury?

The district court granted Johnson judgment as a matter of law solely on the basis of its determination that Johnson did not cause the Eighth Amendment violation. Johnson could not have caused the violation, the district court reasoned, because he did not have final authority at the April 3 meeting to order Rodriguez's release from close management. That lack of authority was dispositive of the issue, the district court concluded, because it was Rodriguez's release from close management that "caused" him to be in the general population where he could be attacked by Arnold Cleveland. In other words, in the district court's view, because Johnson did not have the authority to order Rodriguez's release, it necessarily followed that Johnson's actions could not have caused the subsequent injury. We disagree with the district court's narrow view of causation because it is inconsistent with our precedents in this context. We therefore vacate the judgment as a matter of law entered in favor of Johnson.

For purposes of determining whether Johnson caused the Eighth Amendment violation and Rodriguez's subsequent injury, the "critical" question is whether Johnson was "in a position to take steps that could have averted the stabbing incident . . . but, through [deliberate] indifference, failed to do so." Williams, 689 F.2d at 1384. To determine whether Johnson caused Rodriguez's

26

injury, we look at his "duties, discretion and means." Id.

Applying the concept of causation spelled out in Williams, we held in LaMarca v. Turner that a plaintiff demonstrates the "necessary causal link" in this context where he is able to show that the prison official (1) "had the means substantially to improve" the inmate's safety, (2) "knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence," and (3) had "other means [] available to him which he nevertheless disregarded." 995 F.2d at 1539. Here, the record evidence is sufficient to permit a reasonable juror to find that the "necessary causal link" has been established.[18]

---

[18] Our conclusion in this case is consistent with the Supreme Court's decision in Farmer. There, the Court held that the "question under the Eighth Amendment is whether the prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" 511 U.S. at 843, 114 S. Ct. at 1982 (quoting Helling, 509 U.S. at 35, 113 S. Ct. at 2481). Addressing a causation-related argument, the Court in Farmer rejected the position taken by certain prison officials who insisted that they could not have caused the Eighth Amendment violation because they "had no power to control prisoner placement" at the prison where the inmate was incarcerated. 511 U.S. at 850, 114 S. Ct. at 1985. In rejecting the officials' argument, the Court cited record evidence tending to show that the inmate "was placed in administrative segregation pursuant to . . . a request . . . by staff at [the prison where the officials worked]." Id. (internal quotation marks omitted; emphasis added). Here, Kugler and Johnson offer a similar argument: that they "had no power to control [Rodriguez's] placement" and thus could not have caused the Eighth Amendment violation and Rodriguez's resultant injury. But both Kugler and Johnson said in their depositions that Rodriguez would have been immediately placed in administrative confinement had they "request[ed]" that a protective management review be initiated — in much the same way that the "request" made by the officials in Farmer could determine the inmate's placement within the prison. Thus, as in Farmer, the evidence in this case suggests that Kugler's and Johnson's power to request a protective management review gave them "power to control prisoner placement" at ECI.

First, there is no doubt that Johnson, the chief of security at ECI, had the means substantially to improve Rodriguez's safety. Kugler testified (in his deposition that was introduced at the trial) that if an inmate voiced a life-threatening security concern to him, he was fully authorized to set in motion procedures to place the inmate in immediate administrative confinement and initiate a protective management review aimed at eliminating the risk of harm. That course of action "could have averted," Williams, 689 F.2d at 1384, the life-threatening risk of harm facing Rodriguez because it could have resulted in Rodriguez's transfer from ECI. Indeed, as Kugler testified, if as a result of protective management review "he was deemed to need protection, he would have been put in for a protection transfer." Trial Tr.I at 223.

Second, a reasonable juror could conclude from the evidence that Johnson "knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence." LaMarca, 995 F.3d at 1539. The evidence in this case supports such an inference because the only action Johnson took in response to Rodriguez's requests for protection was to recommend that Rodriguez be returned to the compound — where he would have no protection at all from the Latin Kings who had threatened his life.

Third, the fact that ECI had an established protocol for handling an inmate's

28

life-threatening security concerns — immediate administrative segregation, combined with a thorough protective management review — demonstrates that Johnson had "other means [] available to him which he nevertheless disregarded," LaMarca, 995 F.3d at 1539, and that those means were means that "could have averted," Williams, 689 F.2d at 1384, the substantial risk of serious harm facing Rodriguez.

We are satisfied that the evidence in this case is sufficient to permit a reasonable juror to find the "necessary causal link" between Johnson's actions and Rodriguez's injury.[19] Because we are unable to say that "there [was] no legally sufficient evidentiary basis for a reasonable juror to find for [Rodriguez]" on the issue of causation, Fed.R.Civ.P. 50(a), we must vacate the judgment as a matter of law entered in favor of Johnson.[20]

---

[19] Our causation analysis, and the conclusion we reach, is fully applicable to Kugler.

[20] The dissent points out that Johnson and Kugler had the authority to make only recommendations with respect to placement and classification decisions, which decisions rest with the state classification team. However, we respectfully submit that proof of causation in this case does not turn on the ultimate placement or classification decision with respect to Rodriguez. There was evidence in this case that both Johnson and Kugler, acting alone and independently, had the authority to trigger the "protective management review protocol," which would result in immediate administrative confinement, pending the appropriate investigation and ultimate decision by the state classification team. There was also evidence that Rodriguez was stabbed only hours after being transferred to the general population. Thus, we conclude that a reasonable jury could find that the stabbing at issue in this case would not have occurred if either Johnson or Kugler had acted on the alleged warnings, and caused Rodriguez to be placed in immediate protective confinement pending investigation. Whether Rodriguez would have faced a similar danger upon his ultimate release into the general population, if that were the ultimate

29

## IV.  CONCLUSION

For the reasons stated above, we vacate both the summary judgment entered in favor of Kugler and the judgment as a matter of law entered in favor of Johnson and remand the case to the district court for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

---

decision of the state classification team, is a matter for another day and another case.  Unlike the dissent, we do not consider the causal nexus in this case to be a mere possibility; we believe that a reasonable jury could conclude that it is more likely than not that Rodriguez' injury would have been avoided had either Johnson or Kugler followed the protocol.

COX, Circuit Judge, dissenting:

I respectfully dissent from the court's opinion because Miguel Rodriguez failed to present any evidence from which a reasonable jury could conclude that the conduct of Colonel Johnson or Assistant Warden Kugler caused his injury. I would therefore affirm the district court's decision to grant summary judgment in favor of Kugler[1] and judgment as a matter of law in favor of Johnson.

I discern two holdings in the court's opinion. First, the court disagrees with what it characterizes as the district court's "narrow view of causation" and holds that "the 'critical' question is whether Johnson was 'in a position to take steps that *could have* averted the stabbing incident . . . but, through [deliberate] indifference, failed to do so.'" (Maj. Op. at 26) (emphasis added) (quoting *Williams v. Bennett*, 689 F.2d 1370, 1384 (11th Cir. 1982)). I will refer to this holding as the "primary holding."

Second, the court holds that the Defendants' power to place Rodriguez in temporary administrative confinement, pending a management review protocol, establishes the necessary causation. I will refer to this holding as "the alternative holding." Both holdings lack precedential support in this circuit, and I will discuss

---

[1]The district court did not consider the causation element of Rodriguez's claim against Kugler because it granted summary judgment on other grounds.

31

each in turn.

1.    The Primary Holding

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or *causes to be subjected*, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983 (emphasis added). This court "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation" in § 1983 cases. *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986). "[I]t is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." *Williams*, 689 F.2d at 1381.

"Evidence that an individual defendant had neither the authority nor the resources to prevent the deprivation is material to [the causation analysis]." *Id.* at 1375. The court acknowledges that "[n]either Kugler nor Johnson had final authority (either individually or jointly) to order Rodriguez's release from close management." (Maj. Op. at 10.) That authority rested with the state classification

32

team.

The court relies upon *Williams*, 689 F.2d 1370, and *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), in holding that a "plaintiff demonstrates the 'necessary causal link' in this context where he is able to show that the prison official (1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence,' and (3) had 'other means [] available to him which he nevertheless disregarded.'" (Maj. Op. at 27) (quoting *LaMarca*, 995 F.2d at 1539). Both *Williams* and *LaMarca* involved systematic deficiencies in a prison's protection of inmates. Neither case supports this court's holding on causation. The *Williams* court emphasized the importance of the causation element:

> By contrast, the critical causation issue here must be whether each individual defendant was in a position to take steps that could have averted the stabbing incident at Holman but, through callous indifference, failed to do so. Resolution of this issue necessarily entails a very individualized approach, taking into account the duties, discretion and means of each defendant.
>
> There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party. One may be callously indifferent to the fate of prisoners and yet not be liable for their injuries. Those whose callous indifference results in liability are those under a duty—possessed of authority and means—to prevent the injury.

*Williams*, 689 F.2d at 1384 (footnote omitted). In *LaMarca*, the defendant Turner

33

was a former prison superintendent. That court said the following about causation: "Section 1983 thus focuses our inquiry on whether an official's acts or omissions were the cause—not merely a contributing factor—of the constitutionally infirm condition." *LaMarca*, 995 F.2d at 1538. The *LaMarca* court held that "the evidence strongly supports a finding that, even within the constraints he faced, Turner had the means substantially to improve prisoner safety at GCI." *Id.* at 1539. Indeed, it is unsurprising that a prison superintendent would have the means to improve systematic deficiencies in protecting the safety of prisoners. Here, there is no evidence that either Johnson or Kugler had the means to change Rodriguez's classification. Thus, they had no affirmative duty—which this court requires to impute § 1983 liability to an individual defendant—to protect Rodriguez from the injury he alleges. *See Williams*, 689 F.2d at 1384.

In short, instead of requiring some proof of an affirmative causal connection, as our precedent requires, the court holds that Rodriguez need only demonstrate that Johnson or Kugler failed to take steps to *could have* averted the stabbing.[2] The court fails to consider whether the classification team gave any weight to Johnson's or Kugler's recommendation that Rodriguez be released to the

---

[2]The court says, "we do not consider the causal nexus in this case to be a mere possibility," but no rationale supports this assertion. (Maj. Op. at 30 n.20.)

34

general prison population, a point on which Rodriguez has offered no evidence.[3]

Thus, the inquiry should end here. "The causal relation does not exist when the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers." *Dixon v. Burke County*, 303 F.3d 1271, 1275 (11th Cir. 2002). The state classification team's decision—as deliberate and autonomous decision-makers—to release Rodriguez to the general prison population broke the continuum of causation between Johnson's and Kugler's recommendation and Rodriguez's injury.

## 2.    The Alternative Holding

The court also holds that Johnson's and Kugler's failure to order temporary administrative confinement, pending a protective management review, caused Rodriguez's injury: "[W]e respectfully submit that proof of causation in this case does not turn on the ultimate placement or classification decision with respect to Rodriguez. . . . Whether Rodriguez would have faced a similar danger upon his ultimate release into the general population, if that were the ultimate decision of the state classification team, is a matter for another day and another case." (Maj. Op. at 29-30 n.20.)  The court seems to be saying that *this* particular injury at *this*

---

[3] Rodriguez's burden in proving causation would not necessarily have been onerous; testimony that this recommendation would likely have been followed would have sufficed for the jury to consider whether he proved causation by a preponderance of the evidence.

35

particular time would not have happened if only Johnson or Kugler had initiated protective management review. This is an erroneous view of causation.

"For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000). "Under traditional tort principles, causation has two required elements: cause-in-fact and legal or proximate cause. . . . To establish cause-in-fact, the plaintiff must show that except for the constitutional tort, such injuries and damages would not have occurred." *Id.* at 1168 n.16 (citation omitted).

Ignoring these basic principles of causation, the court holds that a reasonable jury could find that Johnson or Kugler caused Rodriguez's injury, since either or both of them could have placed Rodriguez in administrative confinement while the state classification team conducted a protective management review to determine if his classification should change. This analysis fails the cause-in-fact test. Nothing in the record indicates how long this administrative confinement might have lasted (though it would clearly be only a temporary confinement) or what the result of the protective management review might have been. Rodriguez

36

simply has made no showing that a recommendation for a protective management review would have prevented his ultimate release into the general prison population and his subsequent injury. Thus, there is nothing in the record that demonstrates that Rodriguez's injuries would not have occurred except for Johnson's and Kugler's failure to place him in temporary administrative confinement, pending protective management review. What the court terms "a matter for another day and another case" (Maj. Op. at 30 n.20) is actually the precise question before us today: has Rodriguez demonstrated that Johnson's or Kugler's failure to order temporary administrative confinement was the legal cause of his injury? The answer is no.

To buttress its holding that Johnson and Kugler had "power to control prisoner placement," the court relies on the Supreme Court case of *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970 (1994). In *Farmer*, the defendants argued that they had no power to control placement of the plaintiff, an inmate who had recently been transferred to an out-of-state prison. However, an affidavit from one defendant admitted that the plaintiff was placed in administrative segregation at the out-of-state prison pursuant to a "request" from their office. On this evidence, the Supreme Court concluded that "the record gives at least a suggestion" that the

37

defendants could control prison placement at the out-of-state facility.[4]  *Id* at 850, 114 S. Ct. at 1985.  The court analogizes *Farmer* to this case, holding that the causation element is satisfied since Johnson and Kugler could have "requested" that a protective management review be conducted and thus had "power to control prisoner placement."  We cannot speculate as to what would—or *might*—have happened if Johnson or Kugler had requested a protective management review.  Further, nothing in *Farmer* indicates that the type of administrative segregation involved in that case was in any way akin to the temporary administrative segregation of the kind we have here.

I would affirm the district court.

---

[4]The totality of the *Farmer* Court's discussion of the causation issue is as follows: "Finally, to the extent respondents seek affirmance here on the ground that officials at FCI-Oxford and the Bureau of Prisons regional office had no power to control prisoner placement at Terre Haute, the record gives at least a suggestion to the contrary; the affidavit of one respondent, the warden of USP-Terre Haute, states that after having been at USP-Terre Haute for about a month petitioner was placed in administrative segregation 'pursuant to directive from the North Central Regional Office' and a 'request . . . by staff at FCI-Oxford.' Accordingly, though we do not reject respondents' arguments about petitioner's claim for damages, the record does not permit us to accept them as a basis for affirmance when they were not relied upon below. Respondents are free to develop this line of argument on remand." *Farmer*, 511 U.S. at 850, 114 S. Ct. at 1985-86 (citation omitted).