[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12589
_____

D.C. Docket No. 4:16-cv-01152-AKK-JHE

MITCHELL MARBURY,

Plaintiff-Appellant,

versus

WARDEN, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(August 29, 2019)

Before ROSENBAUM, BRANCH, and HIGGINBOTHAM,* Circuit Judges.

_____

* Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit,
sitting by designation.

PER CURIAM:

Mitchell Marbury, a prisoner at Alabama's St. Clair Correctional Facility, was attacked by a fellow prisoner after making multiple requests to be transferred to a different dormitory or put in protective lock-up. He sued an officer in his cell block and warden of the prison under 42 U.S.C. § 1983, arguing that both were deliberately indifferent to a substantial risk to his safety. Marbury appeals the district court's grant of summary judgment to both defendants. We affirm.

## I

The following reflects the facts as contained in the limited summary judgment record in this case. Between February and April 2016, Marbury repeatedly attempted to be transferred to another dormitory. He sent a written request to Warden Dewayne Estes on February 12, 2016, stating that he had witnessed over fifteen inmate-on-inmate stabbing incidents that appeared to be gang related and asking to be assigned to a "more sociable" living area with inmates closer to his own age. Estes did not act on this request.[1] Marbury's sworn complaint avers that around the same time, he made several in-person transfer requests to Officer Beverly Warren and that Warren told him that if he continued to make transfer requests, she "would personally see to it, that it be fixed, where she'll have a legal reason to deny [the] requests." The complaint also alleges that

---

[1] Estes stated in his affidavit that he was unaware of the request.

2

Warren made other comments like "[Y]ou don't enjoy hanging out with the 'thugs,' afraid you might get shanked!" and "I got the keys to the city baby, you[] locked in."

On April 5, Marbury sent another letter to Estes asking why he had not heard back regarding his February 12 letter.[2] He said that he had seen prisoners disrespect and attack security staff and felt "nothing is being done to correct the problem," and requested to be moved "from a[n] over-rated gang affiliated block to a program block or one where [he could] feel safe and secure[ ]."

On April 18, Marbury asked Warren to have the captain put him in lock-up until he could be transferred because he had heard from a friend that another inmate wanted to hurt him. He avers that Warren responded, "[D]o you really think I'ma act upon your requests, after you've filed complaints and requests against me," started laughing, then said, "You don't have a shank, . . . you need to get one, [because you aren't] going to lock-up, there's no cells available, so seem[s] like to me you've got a problem." One day later, Marbury again wrote to Estes saying, "I was told by a friend to watch my back, because he got word someone was out to do harm to me." He requested that Estes place him in lock-up as soon as he received the complaint because he was "in fear of [being] hurt or possibl[y] killed." He also

---

[2] The day before, Marbury had sent a letter to another prison official—not a defendant in this lawsuit—accusing Warren of retaliating against him for requesting to be transferred. While Marbury also brought a retaliation claim in the district court, he does not pursue it on appeal.

3

reported to Estes that Warren had laughed at him when he told her about his concerns and told him to get a knife. The captain in charge of placing inmates in lock-up says that she did not receive any information about Marbury's request to be locked up.

On April 23, 2016, Marbury was stabbed and hit in the face in the prison's dayroom. He was treated for multiple stab wounds and a broken nose. Prison staff stated that they were unable to identify who attacked him, though they learned from other inmates that he was stabbed because he had called another inmate's girlfriend.

Marbury filed a pro se § 1983 complaint against Estes and Warren in the Northern District of Alabama, alleging that they failed to protect him from unsafe conditions, were deliberately indifferent to those conditions, and retaliated against him for exercising his constitutionally protected rights. The magistrate judge construed the defendants' special report as a motion for summary judgment and issued a report and recommendation to grant them summary judgment on all claims. Marbury objected on the deliberate-indifference issue. The district court overruled Marbury's objections, adopted the report, and accepted its recommendation. Marbury now appeals the grant of summary judgment to the defendants.

**II**

4

We review the district court's grant of summary judgment de novo, "view[ing] all the evidence and draw[ing] all reasonable inferences in the light most favorable to the non-moving party."[3] Summary judgment is warranted where the evidence in the record "presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party."[4] Where, as here, an inmate proceeded pro se in the district court, his summary judgment pleadings are construed liberally and "specific facts" alleged in his sworn complaint can suffice to generate a genuine dispute of fact.[5]

### III

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Marbury concedes that the defendants were performing their discretionary duties at all times relevant to this appeal. Once it has been determined that the official was acting within his discretionary duties, the burden shifts to the plaintiff to show (1)

---

[3] *Caldwell v. Warden*, 748 F.3d 1090, 1098 (11th Cir. 2014).

[4] *Id.* (quoting *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1307 (11th Cir. 2013)).

[5] *Id.* (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986); and *Sammons v. Taylor*, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992)).

5

that the official violated a constitutional right and (2) that the right was clearly established at the time of the alleged violation. *Caldwell*, 748 F.3d at 1099. Our inquiry "can begin with either prong." *Morris v. Town of Lexington*, 748 F.3d 1316, 1322 (11th Cir. 2014).

It is well settled that prison officials must "take reasonable measures to guarantee the safety of the inmates,"[6] and "[a] prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if [the official] is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury."[7] Not "every injury suffered by one inmate at the hands of another," however, "translates into a constitutional liability for prison officials responsible for the victim's safety."[8] To establish a § 1983 claim for deliberate indifference, a plaintiff must show "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."[9]

The first element of deliberate indifference—whether there was a substantial risk of serious harm—is assessed objectively and requires the plaintiff to show "conditions that were extreme and posed an unreasonable risk of serious injury to

---

[6] *Caldwell*, 748 F.3d at 1099 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

[7] *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016).

[8] *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam) (quoting *Farmer*, 511 U.S. at 834).

[9] *Lane*, 835 F.3d at 1307 (quoting *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995)).

his future health or safety."[10] The second element—whether the defendant was deliberately indifferent to that risk—has both a subjective and an objective component. Subjectively, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference."[11] Objectively, the official must have responded to the known risk in an unreasonable manner, in that he or she "knew of ways to reduce the harm" but knowingly or recklessly declined to act.[12] Finally, the plaintiff must show a "necessary causal link" between the officer's failure to act reasonably and the plaintiff's injury.[13]

Marbury argues that the defendants were subjectively aware of two distinct types of risk. The first is the general threat posed by inmate-on-inmate violence in Marbury's cell block based on his statement that he had witnessed fifteen stabbings at the prison. The second is the threat Marbury identified in April 2016, when he told the defendants that he had heard from a friend that someone intended to harm him. He also argues that the defendants were deliberately indifferent in failing to further investigate his claims before the attack.

---

[10] *Id.*

[11] *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 617 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 837).

[12] *Id.* at 620 (quoting *Hale*, 50 F.3d at 1583).

[13] *Id.* at 622–23.

As we explain, Marbury's deliberate-indifference claim fails because he has not demonstrated a genuine factual issue as to whether the defendants were deliberately indifferent to a substantial risk of serious harm to Marbury. Since Marbury has not met his burden to show the violation of a constitutional right, we need not proceed past step one of the qualified-immunity analysis.

## A

Marbury repeatedly asked to be transferred because he was concerned about a general lack of safety in his cell block. In his letters to Estes and the verbal requests he says he made to Warren, he told them that he had witnessed fifteen inmate-on-inmate stabbings that he attributed to gang affiliations, expressing fear for his own safety. Granting Marbury the resolution of all disputed facts in his favor, our caselaw nevertheless establishes that this evidence was insufficient to establish deliberate indifference to a substantial risk of serious harm.

In general, a plaintiff must show "more than a generalized awareness of risk" to make out a deliberate-indifference claim.[14] While "occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, . . . . confinement in a prison where violence and terror reign is

---

[14] *Caldwell*, 748 F.3d at 1101 (internal quotation marks omitted).

8

actionable."[15] To establish deliberate indifference based on a generalized risk, the plaintiff must show "that serious inmate-on-inmate violence was the norm or something close to it."[16]

Turning to this case, we look to only those facts contained in the summary judgment record. While Marbury's sworn allegation may support the inference that Marbury faced some generalized risk of attack, such evidence does not support the conclusion that serious inmate-on-inmate violence was so pervasive that it constitutes a substantial risk of serious harm to which defendants were deliberately indifferent. The only allegation Marbury makes about inmate-on-inmate violence is his statement that he personally witnessed fifteen inmate-on-inmate stabbings during his time at St. Clair.[17] There is no evidence in the record of the total prison population or the sections of the prison in which the attacks occurred that would place Marbury's statement in context. Also, it is not precisely clear from the record over what period of time these incidents occurred. But we can tell from the record that Marbury was at St. Clair between 2002 and 2007, went to a different

---

[15] *Purcell ex rel. Estate of Morgan v. Toombs Cty.*, 400 F.3d 1313, 1320 (11th Cir. 2005) (quoting *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)); *accord Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014).

[16] *Purcell*, 400 F.3d at 1322.

[17] In Marbury's objection to the report and recommendation, he argued that additional discovery would substantiate his claim of widespread violence "a year prior to[ ] and a year after" Marbury's departure from St. Clair. His affidavit also stated he had witnessed over fifteen stabbings over the "short time" he had been at St. Clair.

correctional facility, and then returned in 2015. So, the fifteen stabbings may have occurred over the course of 6 years, for a rate of 2.5 per year.

Marbury's allegation stands in sharp contrast to those at issue in *Harrison v. Culliver*, for example, where we held that even though a prison warden was on notice that inmate-on-inmate assaults occurred throughout the prison and in a particular location where a prisoner was attacked, "the evidence of inmate-on-inmate assault involving weapons [did] not . . . indicate that inmates were 'exposed to something even approaching the constant threat of violence.'"[18] We emphasized that the institution in *Harrison* was large, housing between 830 and 990 inmates between 2005 and 2008, and the fact that there had been thirty-three incidents involving weapons during the same time period was "hardly sufficient to demonstrate that [the institution] was a prison 'where violence and terror reign.'"[19] And Marbury has presented far less evidence about the level of violence than the evidence presented in *Harrison* that we found "hardly sufficient" to establish deliberate indifference to a substantial risk of serious harm.

Moreover, when we have held that a generalized risk of violence from a prison population could support a claim of deliberate indifference to a substantial risk of serious harm, the plaintiff has pointed to specific features of a facility or its

---

[18] 746 F.3d at 1299–1300 (quoting *Purcell*, 400 F.3d at 1321).
[19] *Id.* at 1300 (quoting *Purcell*, 400 F.3d at 1320).

population rendering it particularly violent. This evidence has included pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence,[20] tensions between different subsets of a prison population,[21] and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness.[22] Even if Marbury had shown a risk of generalized prison violence, he has made no allegations regarding the specific features of the prison that would make it particularly violent.

We emphasize that the record before the district court was limited.[23] While we are sensitive to Marbury's pro se status before the district court, the evidence Marbury has presented regarding a general risk of inmate-on-inmate violence does not rise to the level necessary to show deliberate indifference to a substantial risk

---

[20] *See, e.g.*, *Lane*, 835 F.3d at 1307–08 (finding allegations that only one officer supervised two separate dorms, that inmates regularly brought back weapons from their work detail and fashioned them from prison materials, and that officials did not confiscate weapons sufficient); *Hale*, 50 F.3d at 1582–83 (finding potential awareness of a substantial risk of serious harm where a defendant was aware that a prison had severe overcrowding problems and the plaintiff presented evidence that "inmate-on-inmate violence occurred regularly when the jail was overcrowded").

[21] *See Lane*, 835 F.3d at 1307–08 (finding potential awareness of a substantial risk of serious harm where a plaintiff alleged that a particular prison building was composed of 90% gang members, it was common for the non-gang-affiliate inmates or non-Muslim inmates to be robbed or stabbed, and the prison had inadequate supervision to prevent inmates from making homemade weapons).

[22] *See Cottone v. Jenne*, 326 F.3d 1352, 1355–56, 1358–59 (11th Cir. 2003) (finding potential awareness of a substantial risk of serious harm where mentally ill inmates were separated from the general population but kept in unlocked cells where they could interact with each other, and guards were aware of a particular prisoner's history of violent schizophrenic outbursts).

[23] Marbury does not argue that the district court improperly limited discovery.

11

of serious harm required by our caselaw. This sparse record at most shows that inmates at St. Clair faced some risk of assaults by fellow prisoners, but we have said that some risk of harm is insufficient.  Marbury has thus failed to produce evidence that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm.

**B**

Marbury also argues that even if the defendants were not deliberately indifferent to a general lack of safety in his cell block, they were at least deliberately indifferent to the more specific threat he warned them about in April 2016—that he had heard from a friend that someone intended to harm him. As we have explained, Marbury's sworn complaint alleges that when he told Warren about this threat she laughed at him, told him she was not going to act on his request because he had filed internal complaints against her, and told him to get a knife or a shank if he did not already have one. Marbury then wrote another letter to Estes telling Estes about the threat and Warren's response, requesting to be placed in lock-up, and stating that he was afraid of being hurt or possibly killed. On the summary judgment record, Marbury appears to have provided no further information to either defendant about the nature of the threat.

We must therefore decide whether a reasonable jury could find Marbury's statement that he had heard from a friend that an unnamed prisoner intended to

12

hurt him, and that he was afraid of being hurt or killed, without any further details, sufficient to make the defendants aware of a substantial risk of serious harm. While this question is a close one, we conclude that our precedent does not allow Marbury's deliberate-indifference claim to proceed.

On the one hand, it is settled that "a prison official [cannot] escape liability for deliberate indifference by showing that . . . he did not know that the complainant was especially likely to be assaulted *by the specific prisoner who eventually committed the assault*," as long as the official was otherwise aware that the victim faced a substantial risk of serious harm.[24] Our caselaw also establishes, however, that officials must possess enough details about a threat to enable them to conclude that it presents a "strong likelihood" of injury, not a "mere possibility."[25] The unfortunate reality is that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm."[26]

We have therefore upheld dismissal of or summary judgment against deliberate-indifference claims where, although a plaintiff told prison officials about a threat by another inmate or inmates, the prison officials were not deliberately

---

[24] *Rodriguez*, 508 F.3d at 619 (quoting *Farmer*, 511 U.S. at 843) (alterations in original).
[25] *E.g.*, *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990).
[26] *Prater v. Dahm*, 89 F.3d 538, 542 (8th Cir. 1996).

13

indifferent to a *substantial* risk of harm. For example, we held that a plaintiff had

failed to allege plausibly that prison officials were deliberately indifferent to a

strong likelihood of serious harm where he was attacked by an inmate in the next

cell when all of the cell doors opened and a riot began.[27] We noted that even

though the plaintiff alleged that the attacker had threatened him previously and that

an attack was possible, he had not alleged any information showing a strong

likelihood that he and his attacker would be released at the same time in a chaotic

environment.[28] Successful deliberate-indifference claims will generally require

some further reason—beyond the plaintiff having informed the defendant officers

of the threat—that a prison official could have concluded that a particular threat

evidenced a substantial threat, rather than the mere possibility, of serious harm.

For example, a plaintiff can establish deliberate indifference to a substantial

risk of serious harm where he has given prison officials further information

enabling them to conclude that the risk was substantial and not merely possible. In

*Rodriguez v. Secretary for Department of Corrections*,  a prisoner informed prison

staff that members of his former gang had threatened to kill him upon release into

the general prison population.[29] We concluded that if true, this allegation was

---

[27] *Brooks v. Warden*, 800 F.3d 1295, 1298–99, 1301 (11th Cir. 2015).

[28] *Id.* at 1301.

[29] *See Rodriguez*, 508 F.3d at 612–15.

14

enough to place the defendants on notice of a substantial risk of serious harm—so we allowed the case to proceed.[30] The key distinction between *Rodriguez* and Marbury's case is that *Rodriguez* involved a series of threats that contained enough specific information—the threats came from members of the plaintiff's former gang—that prison officials could have reasonably inferred that there was a substantial, not merely possible, risk of harm. In fact, *Rodriguez* observed that a vague statement like "I have a problem with another inmate in this compound," absent some information "about the nature of the anticipated risk," would not have created a genuine issue of fact regarding deliberate indifference to a substantial risk of serious harm.[31] Marbury's statement that an another inmate told him another inmate intended to harm him is precisely this type of vague statement that conveys nothing about the nature of the anticipated risk that we cautioned in *Rodriguez* would not rise to the level of deliberate indifference to a substantial risk.

Marbury's argument is essentially that every prisoner who tells prison officials about an unspecified threat from an unspecified inmate without more is entitled to protective custody or a transfer. But, as already explained, our caselaw establishes a higher standard for deliberate indifference. To be clear, Marbury was

---

[30] *Id.* at 621–22.
[31] *Rodriguez*, 508 F.3d at 619 n.15.

not required to identify the person who was threatening him by name,[32] or even necessarily to give the defendants advance notice of a potential attack,[33] so long as other facts put the defendants on notice that he faced a substantial risk of serious harm. It may be possible for a general threat of inmate-on-inmate violence in a prison to bolster an otherwise insufficient unspecified threat of harm. But, as already discussed, Marbury has not shown anything close to such a substantial threat from the generally violent nature of the prison environment.  And because Marbury has not presented anything else that would bolster the unspecified threat, he has not met the requirement of showing deliberate indifference to a substantial risk of serious harm.

Marbury further emphasizes that when he told Warren about the threat from an unidentified inmate, she laughed at him, told him she was not going to act on his request because he had filed complaints against her, and advised him to get a knife or a shank because it seemed as though he had a "problem." He suggests that this reaction demonstrated her awareness that he faced a substantial risk. The district court did not explicitly address Marbury's argument, noting that "[a]ccording to defendant Warren, she never said this and asserts that she did not know the plaintiff was in danger of being attacked by another inmate on April 23,

---

[32] *See, e.g.*, *Rodriguez*, 508 F.3d at 619 (discussing *Farmer*, 511 U.S. at 843).
[33] *See Farmer*, 511 U.S. at 848.

16

2016." Again, "specific facts" alleged in a pro se plaintiff's sworn complaint can suffice to generate a genuine factual issue.[34] We must therefore accept as true, for the purposes of summary judgment, that Warren made these statements.

But the statements ultimately do not affect Warren's entitlement to summary judgment. The Supreme Court has made clear that "[w]hether a prison official had the requisite knowledge of a substantial risk is a *question of fact* subject to demonstration in the usual ways, including inference from circumstantial evidence."[35] While Marbury can establish Warren's subjective knowledge through circumstantial proof, he must nevertheless present evidence sufficient to "support a reasonable jury's finding that [Warren] harbored a subjective awareness that [Marbury] was in serious danger."[36] Viewed in the light most favorable to Marbury, the summary judgment record allows one to conclude that Warren was aware of the potential for inmate-on-inmate violence at the prison, Marbury told her that another inmate was looking to harm him, and she responded by laughing at Marbury and telling him to get a knife because he had a "problem." A reasonable jury could not extrapolate from such statements that Warren was subjectively

---

[34] *See Caldwell*, 748 F.3d at 1098.
[35] *Rodriguez*, 508 F.3d at 617 (quoting *Farmer*, 511 U.S. at 842).
[36] *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013).

17

aware of a *substantial risk of serious harm* to Marbury at the time. Indeed, Marbury concedes in his briefing that Warren's statements were callous jokes.

Again, it bears mention that subjective awareness of only *some* risk of harm to a prisoner is insufficient for a deliberate-indifference claim.[37] At most, the evidence Marbury has put forward would allow a jury to conclude that Warren was put on notice that Marbury faced some unspecified risk of harm to his well-being—not that she was aware he faced the type of substantial risk of serious harm necessary to establish deliberate indifference. Marbury has not marshaled enough evidence to establish a genuine issue of fact on this necessary element of his case.

## C

Finally, we turn to Marbury's suggestion that the defendants were deliberately indifferent in failing to investigate his report that someone was out to harm him or in otherwise failing to abide by prison policy. We have explained that "merely negligent failure to protect an inmate from attack does not justify liability under section 1983."[38] To allow Marbury's deliberate-indifference claim to proceed absent sufficient evidence that the defendants were subjectively aware that he faced a substantial risk of serious harm would elide the "subtle distinction" between deliberate indifference and mere negligence.[39] We cannot condone the

---

[37] *See, e.g.*, *Brooks*, 800 F.3d at 1301; *Brown*, 894 F.2d at 1537.
[38] *Carter*, 352 F.3d at 1350.
[39] *See Goodman*, 718 F.3d at 1333–34.

18

failure to investigate inmates' allegations of threats or to follow policy in reporting potential threats up the chain of command. But our caselaw does not allow these failures, without corresponding subjective awareness of a serious risk of harm, to establish deliberate indifference.

## IV

We affirm the judgment of the district court.

ROSENBAUM, Circuit Judge, dissenting:

We do not sentence people to be stabbed and beaten. But we might as well, if the Majority Opinion is correct.

Time and again, Mitchell Marbury pleaded with Warden Dewayne Estes and Officer Beverly Warren to be transferred to safety; he had witnessed abject lawlessness and unmitigated violence—even against the guards—in his less-than-seven months at St. Clair prison, and he had been warned by a friend that he was the target of an imminent attack. Estes ignored Marbury's pleas. Warren was even worse: she gloated about Marbury's predicament and told him to find a "shank"— a makeshift knife—to fend for himself. Just a few days later, an inmate blocked Marbury's path. Then Marbury was repeatedly stabbed from behind. The attack left Marbury in the infirmary with a puncture wound to the base of his skull, multiple stab wounds to his shoulder area, a broken nose, and a gash two centimeters deep in his back.

Yet somehow, the Majority Opinion concludes that no reasonable juror could ever find that Estes and Warren were deliberately indifferent to a substantial risk of serious harm to Marbury. This misguided decision allows corrections officers, with impunity, to refuse to take any action whatsoever to protect a prisoner in the face of a known threat. Just as bad, today's decision also gives corrections officers license

to perpetuate prison violence by advising a prisoner who reports a threat that "get[ting]" a "shank" is his only protection option.

*Lord of the Flies* is supposed to be a work of fiction; it should not describe the environment in our prisons. Indeed, the Eighth Amendment strictly prohibits prison officials from allowing such treacherous environments to exist. As the Supreme Court has explained, "[h]aving incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course" and allow inmates to hurt one another. *Farmer v. Brennan*, 51 U.S. 825, 833 (1994) (alterations adopted) (citation and quotation marks omitted).

"[G]ratuitously allowing the beating [and stabbing] of one prisoner by another serves no legitimate penological objective." *Id.* (alteration adopted) (quotation marks omitted). It also does not square with society's "evolving standards of decency." *Id.* (quotation marks omitted). Rather, under the Eighth Amendment, prison officials must "provide humane conditions of confinement." *Id.* at 832. And they must "take reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). This means prison officials cannot be deliberately indifferent to a known risk to inmate safety. *Id.* at 833-34.

21

When we look at the record in the light most favorable to Marbury, as we must on Estes and Warren's motion for summary judgment, Estes and Warren were, at best, deliberately indifferent to the known threat posed to Marbury.[1]  The Majority Opinion mistakenly reaches the opposite conclusion because of three errors it makes. First, the Majority Opinion fails to view the facts in the light most favorable to Marbury and to draw all reasonable inferences in his favor.  Second, the Majority Opinion does not account for important facts in its analysis.  And third, the Majority Opinion evaluates the evidentiary components of Marbury's claim separately, rather than considering them as a whole.  As a result, the Majority Opinion misses the forest for the trees.  When these errors are corrected, the record here yields only one possible answer under the Eighth Amendment:  Estes and Warren must be denied summary judgment.  I therefore respectfully dissent from the Majority Opinion.

I divide my discussion into two substantive parts. Section I demonstrates that Marbury provided sufficient evidence to establish Warren and Estes violated his Eighth Amendment right to be free from deliberate indifference.  And Section II explains why Warren and Estes are not entitled to qualified immunity for their alleged violations.

---

[1] Warren and Estes deny Marbury's allegations.  Summary-judgment review of the record, however, requires us to take the facts in the light most favorable to the non-moving party—here, Marbury. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013).  Of course, if a party survives summary judgment, he must convince a jury that the facts are what he says they are.

22

## I.

As I have noted, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828. To establish a deliberate-indifference Eighth Amendment claim, a prisoner must show (1) he was subjected to a substantial risk of serious harm; (2) the defendants were deliberately indifferent to that risk; and (3) a causal connection exists between the prison official's conduct and the Eighth Amendment violation. *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). Here, when we view the record in the light most favorable to Marbury and draw all reasonable inferences in his favor, Marbury satisfies each of these elements.

### A. Marbury presented enough evidence for the jury to conclude that he faced a substantial risk of serious harm.

First, Marbury was exposed to a substantial risk of serious harm. We use an objective standard to assess whether complained-of circumstances constitute a substantial risk of serious harm. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).

Under that standard, we have held that while occasional, isolated attacks do not create a substantial risk of serious harm, "an excessive risk of inmate-on-inmate violence at a jail" does, and "confinement in a prison where violence and terror reign is actionable." *Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga*, 400 F.3d 1313, 1320 (11th Cir. 2005). For example, in *Purcell*, we held that the level of violence

23

there was insufficient to establish a substantial risk of harm where the plaintiff could produce evidence of only "two to three pretty serious inmate fights over a period of nine months and of not very many other fights over a four-year span."  *Id.* at 1323 n.21.  Given those facts, we simply could not say that "inmate-on-inmate violence was the norm or something close to it."  *Id.* at 1322.

On the other hand, we held in *Marsh v. Butler County* that "conditions in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates."  268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007).  This is so because such conditions create "an excessive risk of inmate-on-inmate violence."  *See Purcell*, 400 F.3d at 1320-21.  Notably, we reached the conclusion that the conditions in *Marsh* established a significant risk of serious harm even though the record there did not show a history of inmate assaults resulting in serious injuries.  *Marsh*, 268 F.3d at 1034.

But when conditions like those in *Marsh* are actually accompanied by a history of inmate-on-inmate violence that is "severe enough to require medical attention and even hospitalization on occasion," *Hale*, 50 F.3d at 1583, that circumstance only reinforces the conclusion that a substantial risk of serious harm

exists. This is true even when the complaining prisoner was not expressly threatened. *See Lane v. Philbin*, 835 F.3d 1302, 1307-08 (11th Cir. 2016).

Here, Marbury has described a prison environment where the worst of all worlds collided. Like in *Marsh*, prisoners at St. Clair enjoyed ready access to weapons, and prison officials regularly failed to surveil and control inmates. As Marbury describes it, St. Clair was a place of open lawlessness where, because of a "lack of security staff,"[2] inmates could assault each other and even brazenly pull knives on and stab security staff.[3] In addition, Marbury also alleged a remarkable history of violence during his time at St. Clair, as he recounted witnessing "over 15 inmates-on-inmates stabbing incidents" in less than seven months there.

---

[2] The U.S. Department of Justice investigated and reported on conditions in Alabama's prisons from 2017-18. *See* U.S. Dep't of Justice, Investigation of Alabama's State Prisons for Men (April 2, 2019), https://www.justice.gov/crt/case-document/file/1149971/download ("DOJ Report"). According to the Department of Justice's report, St. Clair employs only 28% of the correctional officers authorized for that prison. DOJ Report at 9-10. To be clear, I mention findings from the DOJ Report as an aside only, for those who may be interested in the continuing conditions at St. Clair, and I do not rely on facts from the DOJ Report in my analysis. *See infra* notes 3-7. Nevertheless, I note that Rule 201 of the Federal Rules of Evidence appears to allow me to rely on the report in adjudicating this motion, since the DOJ Report is a government-agency report, and counsel was put on notice at oral argument that we might consider it. *See K.T. v. Royal Caribbean Cruises, Ltd.*, --- F.3d ----, 2019 WL 3312530, at *5-7 (11th Cir. July 24, 2019) (Carnes, C.J., concurring).

[3] These problems persisted following the events in Marbury's case. For example, the DOJ Report catalogued a March 2018 incident at St. Clair where seven prisoners, with homemade knives drawn, surrounded a correctional officer. DOJ Report at 28. One prisoner used a knife to cut the officer in his stomach before help arrived. *Id.* Similarly, at St. Clair in December 2017, a correctional officer told several inmates to leave a dormitory. *Id.* at 29. In response, one prisoner punched the officer repeatedly in the face and then stabbed him in the face with a homemade ice pick. *Id.* And in October 2017 at St. Clair, an officer directed an inmate to put a shirt on. *Id.* That prisoner returned with a 26-inch-long shank and attempted to strike four officers. *Id.*

25

The Majority Opinion incorrectly asserts that we must assume Marbury meant he witnessed more than fifteen stabbings in six years. *See* Maj. Op. at 9-10. So I pause to explain why the summary-judgment standard requires us to accept that Marbury saw more than 15 inmate-on-inmate stabbings in less than seven months. Marbury attested that he had witnessed "over [fifteen] stabbing[s] during the *short time*" he was housed there (emphasis added). According to the record, as of February 12, 2016, when Marbury first claimed in a letter to Estes that he had witnessed all these stabbings in his short time while at P-Block of St. Clair, he had been housed in St. Clair since July 29, 2015. That is a six-and-a-half-month period. The Majority arrives at its six-year figure only by reaching back fourteen years earlier, when Marbury was previously housed at St. Clair during a five-year period that ended nine years before Marbury's complaint here. Six years, of course, is not a "short time." But six-and-a-half months is.

And even if six years could be considered a "short time," the summary-judgment standard requires us to make all reasonable inferences in Marbury's favor. That means the relevant question is not whether it is reasonable to assume that Marbury was referring to his total six years at St. Clair during the last decade-and-a-half. Rather, the question is whether it is reasonable to infer that Marbury was referring to his most recent six-and-a-half months at St. Clair. Here, it is certainly a reasonable inference that when Marbury spoke of the "short time" in which he saw

26

all the stabbings, he was referring to his then-current six-and-a-half-month period of incarceration at St. Clair.  Indeed, the Majority Opinion offers no reason why that inference is not reasonable.  So we must accept for purposes of evaluating the motion for summary judgment that Marbury witnessed the more-than-fifteen stabbings in six-and-a-half months.

That means a stabbing occurred roughly once every 1.75 weeks, on average, which is three times as often as did the non-specified "weapons" incidents found to be insufficient in *Harrison v. Culliver*, 746 F.3d 1288 (11th Cir. 2014), on which the Majority Opinion relies.  Maj. Op. at 10; *Harrison*, 746 F.3d at 1299-1300 & n.17.  Plus, Marbury's numbers include only stabbings, while *Harrison*'s total of 33 incidents over three-and-a-half years was composed of stabbings *and* all other types of violence involving weapons.[4]  *Harrison*, 746 F.3d at 1299-1300 & n.17.  Simply put, the frequency of stabbings at St. Clair far, far exceeded those at the prison in *Harrison*, and we should not pretend that *Harrison* supports the Majority Opinion's position.  *See* Maj. Op. at 10.

---

[4] St. Clair likewise experienced violence involving other weapons.  For example, in September 2017, two prisoners beat a third with a sock filled with metal locks—and this occurred in St. Clair's honor dormitory, which was reserved for prisoners with good behavior.  DOJ Report at 2.  And in July 2017, a St. Clair prisoner was found tied up and strangled to death.  *Id.* at 13.  Similarly, in May 2016, another prisoner was strangled to death.  *Id.* at 15.  In October 2017, a prisoner was assaulted and severely beaten, and he was bound with tape around his hands, ankles, mouth, and head.  *Id.* at 19.  He also had a fresh burn mark on his face.  *Id.*

27

The danger at St. Clair becomes even more apparent when we account for reasonable inferences in favor of Marbury.  For example, Marbury surely was not always in exactly the wrong place at precisely the wrong time, so he could not have witnessed every single stabbing that occurred in his 900-person prison during his brief time there.  When we factor this common-sense reasoning into the equation, we must conclude that stabbing incidents occurred even more frequently than once every 1.75 weeks, on average.[5]

And contrary to the Majority Opinion's suggestion in its analysis, Marbury did not just allege that he saw over fifteen stabbings in under seven months.  *See* Maj. Op. at 9 ("The only allegation Marbury makes about inmate-on-inmate violence is his statement that he personally witnessed fifteen inmate-on-inmate

---

[5] Indeed, as the Majority Opinion notes, "in Marbury's objection to the report and recommendation, he argued that additional discovery would substantiate his claim of widespread violence 'a year prior to[ ] and a year after' Marbury's departure from St. Clair."  Maj. Op. at 9 n.17.  As it turns out, the DOJ Report confirms he was right.  *See id.*; *supra* notes 3-4; *infra* notes 6-7; *see also* DOJ Report at 48-49 ("Our investigation into the violence, contraband, corruption, and harm occurring in Alabama's prisons evidences issues previously known to ADOC [Alabama Department of Corrections].  For instance, *several years before we initiated our investigation, ADOC was acutely aware of extensive problems at St. Clair*.  In 2014 alone, there were at least three publicly reported prisoner-on-prisoner homicides.  In April 2014, the Equal Justice Initiative ("EJI") urged ADOC to investigate, among other violence, the fatal and non-fatal stabbings that were escalating at St. Clair.  Following another homicide in June 2014, EJI renewed its formal request that ADOC address the violence at St. Clair, including six homicides in the preceding three years. . . . Three years later, in November 2017, the plaintiffs and ADOC reached a settlement.  ADOC promised many reforms in the settlement.  For instance, ADOC promised to ask the Alabama Legislature for funding to install video cameras for monitoring at the prison.  ADOC did not make good on that promise.  By June 2018, ADOC had not satisfied several of the settlement requirements.  The parties went back into mediation in June 2018—only eight months after ADOC made all of its promises to reform St. Clair." (emphasis added)).

stabbings during his time at St. Clair."). Rather, Marbury also alleged that the prison was so understaffed and that conditions were so out of control that prisoners also stabbed security staff and even the warden, and nothing was done to correct the problem.[6]

Against this toxic background, on April 18, 2016—five days before he was brutally attacked—Marbury also directly reported to Warren that a friend had warned him that another inmate wanted to hurt him. For this reason, Marbury asked Warren to send him to lock-up until he could be transferred to a different prison or the threat passed. He also asked Warren to have Captain Carla Graham speak with him, so he could tell her about the threat.

But according to Marbury, Warren refused to pass along his request to Graham and took no action at all: she did not report the threat to anyone; she did not seek to investigate the threat; and she did not do anything to provide Marbury with any type of protection. Instead, Warren allegedly used the opportunity to

---

[6] Again, for those interested, the DOJ Report provides some detail concerning the severity of some of the stabbings that regularly occurred at St. Clair during the period on which it reported. For example, in addition to the stabbings described in note 3, *supra*, the Report stated that in September 2018, a prisoner was stabbed to death at St. Clair and noted that he had previously been stabbed in July 2017 while imprisoned at the same facility. DOJ Report at 13. Similarly, in February 2018, one inmate killed another in a knife fight at St. Clair. *Id.* at 14. In March 2017 at St. Clair, two prisoners stabbed another inmate. *Id.* at 18. When an officer yelled for them to stop, one of the prisoners just kept stabbing the victim. *Id.* After the assault was finally stopped, the victim had to be taken to an emergency room to treat stab wounds to the back, a perforated lung, and a stab wound to the head. *Id.* Then, in February 2018, an officer found a prisoner roaming the prison with a knife stuck in his head. *Id.* at 21. He also had to be taken to an emergency room, where an eight-inch, metal homemade knife was removed from the back of his head. *Id.*

punish Marbury for previously having filed complaints against her.  Warren derided

Marbury:  "[D]o you really think I'm[] [going to] act upon your request, after you've

filed complaints and requests against me[?]"  Then she laughed at him and said,

"[Y]ou don't have a shank[?]  [I]f not[,] you  need to get one, cause you [aren't]

going to lock-up[.]  [T]here[']s no cells available, so seem[s] like to me, you've got

a problem."

Warren's statement that Marbury better get himself a "shank" further supports

the notion that stabbings were regular occurrences at St. Clair and that "shanks" were

readily available.[7]  And her assertion that no cells were open to protect Marbury

from the threat likewise suggests that St. Clair was overflowing with prisoners who

were either misbehaving or under threat of serious harm, further supporting

Marbury's contention that violence at St. Clair was rampant.

So at bottom, Marbury alleged that stabbings were the norm at St. Clair, that

the prison was understaffed, that inmates were out of control and could stab guards

and even the warden, that he had been expressly threatened and had reported that

---

[7] Makeshift knives remained readily available at St. Clair even after Marbury's stabbing. For example, the DOJ Report recounted one incident that occurred at St. Clair in September 2017 and involved four different makeshift knives.  In that incident, a prison official saw two prisoners fighting with box cutters and homemade knives.  DOJ Report at 17.  He radioed for assistance.  *Id.* When one officer began taking one of the prisoners involved to the healthcare unit, a third prisoner sprang into action and stabbed the escorted prisoner in the back.  *Id.*  While the officers were pepper-spraying the third prisoner, a fourth prisoner tried to stab the third prisoner with a knife. *Id.*  One of the prisoners had to be taken to an emergency room (as opposed to the prison's healthcare facility) for treatment of his stab wounds.  *Id.*

threat to prison officials, and that the one prison official directly responsible for helping him specifically refused to do so and instead goaded him to get a "shank."

Yet in its analysis of the overall prison environment, the Majority Opinion severely understates the situation. It isolates the more-than-fifteen stabbings Marbury witnessed and evaluates only whether, in and of themselves, those created a pervasively violent and dangerous prison environment. It then compounds its error by improperly stretching back a decade-and-a-half to make the inference in favor of the defendants that the stabbings occurred over six years instead of over six-and-a-half months. And those facts the Majority Opinion doesn't understate, it simply ignores: nowhere in its analysis does the Majority Opinion discuss Marbury's allegations about the prison's staffing issues or the utter lack of order that allowed prisoners to stab even the guards and the warden. The Majority Opinion also ignores the dire implications of the words and actions of Warren—who was supposed to be Marbury's protector.

Our precedent requires us to consider the entirety of the prison environment in Marbury's favor. When we do that, we can see that, without a doubt, the conditions Marbury faced created a substantial risk of serious harm—both under our binding precedent and as a matter of common sense. If the circumstances here do not describe an environment "where violence and terror reign," *Purcell*, 400 F.3d at 1320, it is difficult to imagine what would.

**B. A reasonable juror could conclude that both Warden Estes and Officer Warren acted with deliberate indifference to Marbury's pleas.**

To establish deliberate indifference, a plaintiff must satisfy both a subjective and objective component of the standard. *Caldwell*, 748 F.3d at 1099. The subjective aspect requires the plaintiff to show that the defendant "actually (subjectively) knew that an inmate faced a substantial risk of serious harm." *Id.* (cleaned up). This means the plaintiff must produce evidence that the defendant was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he . . . dr[ew] the inference." *Id.* at 1099-1100 (quoting *Farmer*, 511 U.S. at 837). We have explained that this inquiry presents a question of fact. *Id.* at 1100. As for the objective component of the standard, the plaintiff must demonstrate that the defendant "disregarded [the] known risk by failing to respond to it in an (objectively) reasonable manner." *Id.* at 1099 (cleaned up).

Here, read in the light most favorable to Marbury, the record establishes Estes's and Warren's deliberate indifference to the substantial risk of serious harm Marbury faced.

i.    The record contains enough evidence for a jury to conclude that Estes and Warren knew that Marbury faced a substantial risk of harm.

As I have noted, whether Estes and Warren knew of facts that would have allowed them to conclude that Marbury faced a substantial risk of serious harm, and

whether they actually drew that inference from those facts, present questions of fact. And "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. For example, a trier of fact can find that the defendant had actual knowledge of the risk if the plaintiff "presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Id.* at 842-43 (quotation marks omitted).

That's what happened here. First, stabbing incidents occurred regularly at St. Clair, and even guards and a warden had been victims of the violence. The prison officials could not maintain order, and prisoners regularly disrespected them. On top of that, Marbury had reported an express threat to both Warren (in person) and Estes (in writing). So the risk the jail conditions and the express threat posed was obvious.

And there can be no doubt that Warren clearly understood Marbury's dangerous dilemma because she literally said as much. Indeed, when Marbury reported the threat against him to Warren, Warren expressly confirmed that Marbury had "a problem." Then she went so far as to suggest that Marbury get a "shank." She may as well have left a smoking gun.

33

Yet the Majority Opinion dismisses Marbury's admissions as insufficient because Warren laughed and "callous[ly] joke[d]" when she made these comments. *See* Maj. Op. at 18. This reasoning, however, again betrays that the Majority Opinion has impermissibly construed the facts in the light most favorable to Warren, not Marbury. Here, it is certainly reasonable to infer from the record that Warren's laughter implicates, not absolves, her: Warren told Marbury she would not help him because he had previously filed complaints about her. It was in this context that Warren laughed at Marbury while acknowledging Marbury's "problem" and telling him to get a "shank." These facts require us to make the more-than-reasonable inference here that Warren fully understood the danger Marbury faced when she "callous[ly] joke[d]" about it. *Cf. Lane*, 835 F.3d at 1309-10 (prison official's threat to punish prisoners by putting them into a building known for its violence supported the reasonable inference that the official was aware of the violent conditions at that building). Notably, the Majority Opinion does not explain why this inference in favor of Marbury is not reasonable.

Next, the Majority Opinion tries to minimize the evidence against Warren as showing only "that Warren was put on notice that Marbury faced some unspecified risk of harm to his well-being—not that she was aware he faced the type of substantial risk of serious harm necessary to establish deliberate indifference." Maj. Op. at 18. But this, too, is error, as the Majority Opinion both ignores inconvenient

34

facts and incorrectly suggests that a prisoner must be able to identify with specificity the precise threat he faces before a prison official has any responsibility to protect him. Maj. Op. at 12-16.

As the Supreme Court has explained, when prison conditions allow for violence and terror to reign, "it [is] obviously . . . irrelevant to liability that the officials could not guess beforehand precisely who would attack whom." *Farmer*, 511 U.S. at 843-44. Based on this principle, we have rejected the notion that a prisoner must identify his attacker to receive protection. In *Rodriguez v. Secretary for Department of Corrections*, for example, the prison official argued that the prisoner's declaration did not put the prison official on notice of the risk of harm because it did not "furnish any specifics as to *who* was posing the alleged threats." 508 F.3d 611, 619 (11th Cir. 2007) (quotation marks omitted). The *Rodriguez* panel rejected that argument, because even though vague statements like "I have a problem with another inmate in this compound" would be insufficient, the inmate in that case had provided additional information—that he had been threatened by members of his former gang—that corroborated otherwise vague statements. *Id.* & n.15.

As with the case in *Rodriguez*, and contrary to the Majority Opinion's assertion, Marbury did not just generally allege that he had been threatened. Maj. Op. at 15-16 ("Marbury's argument is essentially that every prisoner who tells prison officials about an unspecified threat from an unspecified inmate without more is

35

entitled to protective custody or a transfer.").  Instead, Marbury also averred many facts that showed a prison culture of unchecked violence: consistent inmate-on-inmate stabbing attacks requiring medical attention, understaffing of guards, ineffective guarding where even guards were attacked, and no corrective response to these conditions from prison officials.  These allegations are enough under our precedent to establish a serious risk of harm, so "it [was] obviously . . . irrelevant to liability that the officials could not guess beforehand precisely who would attack whom."  *Farmer*, 511 U.S. at 844.  Indeed, in *LaMarca v. Turner*, we have recognized that when the prison environment demonstrates the prison's inability to protect prisoners from violence, that environment alone can support an inference that the prison officials knew and understood that the inmates were not protected.  995 F.2d 1526, 1536-37 (11th Cir. 1993).  Because a norm of unchecked violence at a prison more than sufficiently corroborates a threat, *Rodriguez* supports, not hurts, Marbury's case.

The Majority Opinion also suggests that *Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015), shows that the defendants were not on notice of a substantial risk of harm to Marbury.  *See* Maj. Op. at 14.  But that case is wholly inapposite.  In *Brooks*, Brooks alleged that he had reported threats of physical and sexual assault he had received from the inmate in the adjacent cell, but nothing was done.  *Brooks*, 800 F.3d at 1298.  Then, one day, a freak accident occurred—all 32 doors in

36

Brooks's dormitory opened simultaneously—leading to a riot, and Brooks was attacked by the inmate who had threatened him. *Id.* We held that Brooks had failed to allege a substantial risk of serious harm existed before the prison riot, since harm to Brooks depended on both Brooks's and the threatening inmate's release from their cells at the same time in an unsupervised or chaotic environment where an attack could occur—an unlikely scenario that no one could have been expected to anticipate. *Id.* at 1301. In contrast, Marbury warned that he had been threatened in a prison where deficient supervision was the norm, stabbings were par for the course, and even the guards were constantly at risk. And the conditions described in Marbury's allegations—not an unforeseen accident—were what enabled Marbury to be attacked in the regular course of the prison's business.

In short, that Marbury did not know precisely how or why he was going to be attacked, or who was going to attack him, could not relieve Warren of all responsibility under the circumstances of this case. Based on the prison environment alone, Warren was on notice that Marbury faced a substantial risk of serious harm. In addition, Marbury also reported to Warren that he had received an express threat, and Warren's response effectively admitted that she knew Marbury faced a major threat. A jury would be well within its rights to conclude Warren knew good and well that Marbury was in serious danger. Under our precedent and these facts, and

at this summary-judgment posture, Warren may not escape liability on the adverse inference that she was not aware of the risk to Marbury.

Estes fares no better on this record. Over and over, Marbury wrote to him, worried about prison conditions. On February 12, 2016, Marbury told Estes that he had seen over fifteen stabbings and implored the warden to "look into [the] matter as soon as possible" for the sake of his safety. On April 5, Marbury again wrote to the warden. He told him that he had seen blatant examples of how unsafe his cell block was, as inmates had even pulled knives on and stabbed security staff. He talked about how he wanted to move from his block, which was teeming with gang members, to one where he could be safe. And significantly, he mentioned that he had antagonized a prison officer—Warren—by filing complaints about her, and she had, in turn, falsely accused him of infractions and told him that she "[had] it in for [him]." Then on April 19, four days before he was stabbed multiple times, Marbury wrote again. He described how a friend had told him to watch himself, since the word was that someone wanted to hurt him. He also noted he had immediately told Warren of the threat, and, instead of helping him, she had told him to find a knife because he had a "problem." Marbury begged Estes to put him in lockup because he was afraid of being hurt or killed.

Taking the record in Marbury's favor, we can see that Estes had more than enough information to allow him to realize that Marbury was in danger. Estes was

38

told that violence was rampant and that things were out of control.  Plus, serving as the warden at St. Clair, Estes necessarily knew firsthand of all the stabbings, inmate-on-inmate violence, and inmate attacks on guards.  He also knew of the lack of prison guards.  In addition, Estes knew about the direct threat against Marbury, and he knew that Marbury had a hostile relationship with his would-be protector, Warren.  Further, Estes knew that Warren, after acknowledging that Marbury had a problem, had refused to help him and instead told him to find a "shank."

Of course, for Marbury's claim against Estes to be actionable, Estes must have actually drawn the inference from all this information that Marbury was in danger.  *Farmer*, 511 U.S. at 837.  So he may certainly argue to the jury that he wouldn't know substantial risk of serious harm if it hit him in the face.  But on this record, a reasonable jury could conclude that Estes knew Marbury was in serious danger "from the very fact that the risk was obvious."  *Id*. at 842.  For our purposes on summary judgment, then, we must conclude that Estes knew Marbury faced a substantial risk of harm.

ii.    Estes and Warren responded unreasonably given their knowledge that Marbury faced a substantial risk of harm.

A reasonable jury could also find that Estes and Warren responded in an objectively unreasonable manner to the danger Marbury faced.  "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly declined to act or if he knew of ways to reduce

39

the harm but recklessly declined to act." *Rodriguez*, 508 F.3d at 620 (quotation marks omitted). Both Estes and Warren knew of ways to reduce the risk of harm to Marbury but failed to take advantage of those opportunities.

I begin with Warren. Warren responded unreasonably to the known risk of harm to Marbury when she refused to take steps known to her that could have reduced the risk. Estes declared in his affidavit that "[w]hen inmates are experiencing issues[,] all they need to do is report the situation to any Correctional Officer[,] and the Correctional Officer *will report it up their chain of command*" (emphasis added). But when Marbury went to Warren on April 18 with information that he was being targeted for attack, Warren rebuffed him. She refused to report the threat up the chain of command or to do anything else at all to help him. And she did nothing even though she knew she was supposed to report Marbury's concerns to her superior.[8] Under these circumstances, Warren's total inaction to reduce the risk of harm to Marbury was unreasonable.

Estes also failed to take known and reasonable action to mitigate the risk to Marbury. Estes noted in his affidavit that when an inmate requests to be moved, he "always refer[s] those requests to the appropriate Correctional Captain." He

---

[8] Warren claims that after one of Marbury's complaints, she spoke with a captain about Marbury's safety concerns. But she cannot recall the captain with whom she spoke, and no captain has corroborated her claim. At best, this presents a question of fact for the jury.

identified the appropriate captain during the relevant period as Captain Carla Graham.

But according to Graham, Estes did not mention Marbury to her until after he had been sued for deliberate indifference (long after Marbury had been attacked). And Estes provided no evidence that he did *anything in response* to Marbury's repeated pleas for help. Instead, he based his defense of his actions on the existence of the prison's metal detectors that inmates leaving the Trade School and Alabama Correctional Industries must go through as they exit that area, and the metal detectors that scan inmates entering the prison infirmary. But neither of those generalized security measures was geared to protect against the threat to Marbury: the metal detectors at the Trade School and Correctional Industries obviously do nothing to sniff out shanks made on the prison grounds, and the metal detector at the infirmary was useless to Marbury (until, ironically, after the stabbing), since he was not in the infirmary when he complained about the prison conditions and the express threat. As for Estes's assertion that the jail has a portable "cell sense" it "deploy[s] daily at different locations" to detect cell phones or weapons, Estes's affidavit provides no information concerning the success of the technology or how many inmates it assesses on a daily basis. And since this is a motion for summary judgment, we must draw from Estes's failure to include any information on the efficacy of such technology the inference in favor of Marbury that the "cell sense" is, at best,

41

minimally effective, if effective at all, in making a dent in the prison's widespread "shank" problem.[9]

More fundamentally, these measures do not even attempt to address the express threat made to Marbury. It cannot be a defense to deliberate indifference to parade protocols designed for general safety to cover up what occurred here—failure to take any steps at all to alleviate the particularized substantial risk of serious harm to an inmate despite knowledge of the threat the inmate faced.

In sum, both Estes and Warren knew that Marbury was in danger and yet did nothing to help. That was objectively not reasonable. As a result, a jury could find that they both engaged in deliberate indifference.

## C. A jury could reasonably find that Estes's and Warren's deliberate indifference caused Marbury's injuries.

The critical question for purposes of determining whether a defendant's deliberate indifference caused the subsequent injury is whether the defendant was "in a position to take steps that could have averted the stabbing incident . . . but, through deliberate indifference, failed to do so." *Rodriguez*, 508 F.3d at 622 (alterations adopted) (quoting *Williams v. Bennett*, 689 F.2d 1370, 1384 (11th Cir. 1982)). In answering this question, we look to whether the prison official (1) "'had the means substantially to improve' the inmate's safety," (2) "knew that the actions

---

[9] In fact, as the DOJ Report shows, neither measure was all that effective at preventing attacks at St. Clair. *See supra* notes 3-7.

he undertook would be insufficient to provide the inmate with reasonable protection from violence," and (3) "had other means available to him which he nevertheless disregarded." *Id.* (alterations adopted) (quoting *LaMarca*, 995 F.2d at 1539).

When we applied this standard in *Rodriguez*, we found that a prison official caused the plaintiff's injuries when the official was able—but failed—to put the plaintiff in administrative segregation and initiate a protective review. *Id.* at 622-23. On the first factor, *Rodriguez* explained that a jury could have found that the official had the means to improve the plaintiff's safety, since the official was authorized to put the plaintiff in lockup and start a protective review. *Id.* at 623. And if the protective review had concluded that the plaintiff was in danger, the plaintiff would have been transferred, which would have averted the stabbing he suffered. *Id.* As to the second factor, *Rodriguez* held that a jury could have found that the official knew his inaction would be insufficient to protect the plaintiff. *Id.* On the final factor, *Rodriguez* noted that the prison had an established protocol for handling an inmate's security concerns—immediate segregation and protective review—that showed the official disregarded available means that could have helped the plaintiff. *Id.*

*Rodriguez* maps perfectly onto Marbury's case. On the first factor, a jury could conclude that both Estes and Warren had the means to substantially improve the inmate's safety. Estes, as the warden, had the authority to put Marbury in

43

protective lockup.  And as I have noted, both Estes and Warren could have taken advantage of the prison's established protocol for dealing with threats to prisoners by triggering a protective review for Marbury by referring Marbury's concerns to Graham for investigation.  *See supra* at 40-41.  Like the case in *Rodriguez*, had Graham's investigation discovered the threat Marbury faced, the stabbing Marbury suffered just a few days later could have been averted.

On the second factor, a reasonable jury could find that both Estes and Warren knew their inaction would be insufficient to protect Marbury.  Just as the jury in *Rodriguez* could have determined that the defendant there knew his total inaction would be insufficient to protect the inmate, a jury in this case could find that Estes and Warren knew their total inaction would be insufficient to protect Marbury.

And on the final factor, a reasonable jury could conclude that Estes and Warren had other means available to them to help Marbury.  As Estes admitted, they could have at least referred Marbury's concerns to the appropriate captain—here, Graham—for investigation.

Estes and Warren thus failed to take steps that could have averted the attack on Marbury, despite their being in a position to take those steps.  Under our caselaw, a jury could reasonably find from this evidence that Estes and Warren caused Marbury's injuries.

44

## II.

Because Marbury satisfied all the elements for proving a successful deliberate-indifference claim, I next consider whether qualified immunity nonetheless shields Estes and Warren from suit. Qualified immunity "completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). To take advantage of qualified immunity, the government official must first demonstrate that she acted within her discretionary authority. *Id.* If she makes that showing, the burden shifts to the plaintiff to establish that his allegations, if true, demonstrate a violation of clearly established law. *Id.* at 1358.

Estes and Warren were acting within their duties as prison officers when they engaged in the acts and omissions at issue here, so Marbury must allege a violation of clearly established law. As I have explained, *see supra* at Section I, Marbury has successfully alleged all the elements of a deliberate-indifference violation. The only question is whether the law of deliberate indifference that Estes and Warren violated was clearly established at the time of the events.

45

The touchstone inquiry under the "clearly established" prong of qualified immunity is whether the officials charged had "fair warning" that their conduct constituted a constitutional violation. *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). As relevant here, a plaintiff can establish fair warning in two ways: he can show that the unlawfulness of the defendants' actions was apparent in light of pre-existing caselaw, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), or he may demonstrate that the defendants' actions were so egregious that they violated a broader constitutional rule with obvious clarity, *Gaines*, 871 F.3d at 1208-09.

### A. Caselaw at the time of the events gave Estes and Warren fair notice that their actions violated the Eighth Amendment.

Prison officials have fair notice of their obligations if controlling caselaw at the time of the events at issue previously established the governing principles involved, even if the existing cases were not factually identical. *Hope*, 536 U.S. at 741-42. For example, in *Hope*, the Supreme Court denied qualified immunity to prison officials who had handcuffed the plaintiff to a hitching post for an extended period. *Id.* at 744-46. It did so because it found that two prior Supreme Court cases and a Department of Justice report put the officials on notice that the practice was illegal. In particular, the Court pointed to *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974), which held that handcuffing inmates to a fence for long periods is unconstitutional, and *Ort v. White*, 813 F.2d 318, 324 (11th Cir. 1987), which stood for the proposition that "physical abuse directed at a prisoner *after* he terminates his

46

resistance to authority" is unconstitutional. *Hope*, 536 U.S. at 741-43 (alterations adopted) (quotation marks omitted). As for the Department of Justice report, the Court noted it condemned the practice of using a hitching post to punish prisoners. *Id.* at 744-45. In light of these authorities, the Supreme Court concluded that a reasonable officer was on notice that handcuffing the plaintiff to a hitching post was unconstitutional. *Id.* at 745-46.

Here, our long-standing precedent gave Estes and Warren fair notice that their inaction was unconstitutional. In *Purcell*, we explained that an inmate faces a substantial risk of harm if "serious inmate-on-inmate violence was the norm or something close to it." *Purcell*, 400 F.3d at 1322. In *Lane*, we found that violent prison conditions could pose a substantial risk of serious harm to an inmate, even when the complaining prisoner was not expressly threatened. *See Lane*, 835 F.3d at 1307-08. And when a prisoner is threatened, we have held in *Rodriguez* that even a vague threat should be taken seriously if prison conditions corroborate the weight of that threat. *Rodriguez*, 508 F.3d at 618-19 & n.15. We have also noted that regular inmate-on-inmate violence requiring medical attention creates a substantial risk of serious harm. *Hale*, 50 F.3d at 1583. And for over a decade, we have maintained the commonsense notion that "it is an unreasonable response for an official to do nothing when confronted with prison conditions . . . that pose a risk of serious physical harm to inmates." *Marsh*, 268 F.3d at 1034.

47

Given the preexisting caselaw, it is certainly fair to say that Estes and Warren had notice that in a violent environment where stabbings were the norm, it was unreasonable to do absolutely *nothing* in the face of a prisoner's report that he was being targeted for attack. For this reason, qualified immunity does not protect Estes and Warren.

### B. Warren's conduct was so egregious that it violated the Eighth Amendment with obvious clarity, even without the guidance of prior caselaw.

The foundational principle behind much of the previously discussed caselaw is the one I began this dissent with, the one the Supreme Court articulated over two decades ago in *Farmer*: being attacked in prison is not part of the constitutional scheme of punishment that we mete out to individuals, and the Eighth Amendment prohibits prison officials from being deliberately indifferent when they know that an inmate is in danger. *Farmer*, 51 U.S. at 833-34. Warren's alleged conduct here stands in such stark contrast to the range of behavior acceptable under the Eighth Amendment that if a jury believes Marbury's account, Warren engaged in deliberate indifference with obvious clarity.

Under Marbury's account, Marbury was housed in a brutal environment where stabbings occurred regularly. He personally witnessed more than fifteen stabbings in his brief time at St. Clair. And Warren, who was supposed to protect him, expressed outright hostility towards Marbury when he reported a threat against

48

him.    She refused to help in any way, laughed and expressed glee after acknowledging the seriousness of his dilemma, and told him to get a "shank."  Five days later, Marbury was repeatedly stabbed and beaten.  Short of stabbing Marbury herself, it is hard to imagine how Warren could have been less helpful.  A prison official does not need a court to tell her that this is not okay to know that it is not okay.

Clearly, this is not a case where the good-faith efforts of an official charged with making tough decisions turned out, in hindsight, to be insufficient.  When I make all reasonable inferences for Marbury, I must conclude Warren's actions were not only reckless, they were malicious.  And no reasonable prison official could have believed that maliciously refusing to protect a prisoner from a known threat comports with her Eighth Amendment duty to protect prisoners from harm. Qualified immunity was never designed to protect actions like these.  So Warren is not entitled to qualified immunity on this ground as well.  *See Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (denying qualified immunity to an officer who used such grossly disproportionate force that no reasonable officer could have thought the action was legal).

## III.

The Eighth Amendment does not allow prisons to be modern-day settings for *Lord of the Flies*.  When a prison official knows of a substantial threat of serious

49

harm to an inmate, she must undertake reasonable action to protect that inmate. It should go without saying that refusing to help in any way—and worse yet, laughing at the prisoner's predicament and telling him to get a "shank"—is simply not an option. Yet by declining to allow Marbury to hold Warren and Estes responsible here, the Majority Opinion condones this behavior and ensures it will occur again. I therefore dissent.