[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-11525
Non-Argument Calendar
_____

D.C. Docket No. 1:19-cv-00706-JB-B

JOSHUA DICKINSON,

Plaintiff-Appellee,

versus

SAM COCHRAN,
Sheriff,
WARDEN,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(October 28, 2020)

Before BRANCH, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Joshua Dickinson was stabbed by his cellmate while they were being held at the Mobile County Metro Jail.  Dickinson sued the sheriff, Sam Cochran, and the warden, Noah Price "Trey" Oliver, under 42 U.S.C section 1983 for failing to protect him from harm from other inmates and for failing to properly staff the jail and train and supervise their officers.  Sheriff Cochran and Warden Oliver moved to dismiss Dickinson's complaint based on qualified immunity, which the district court denied.  Sheriff Cochran and Warden Oliver appeal the denial of qualified immunity.  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

We discuss the complaint's allegations in the light most favorable to Dickinson.  Corbitt v. Vickers, 929 F.3d 1304, 1308 n.1 (11th Cir. 2019).  In early 2003, the Department of Justice began an investigation into the conditions at the Mobile County Metro Jail.  In 2009, the department compiled its written findings in a letter to Mobile County, Alabama officials.[1]  The department "found that [the jail] failed to protect inmates from harm adequately" and "noted a high, and increasing, level of inmate-on-inmate violence."  The department, as an example, pointed to one four-month period in which the jail reported 89 fights.  The department's

---

[1] The parties agree that the letter is "authentic and a matter of public record" and "the Court may consider it fully incorporated into the . . . [c]omplaint by reference."  See Daewoo Motor Am., Inc. v. Gen. Motors Corp., 459 F.3d 1249, 1266 (11th Cir. 2006) ("if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document if that document is central to the plaintiff's claims" (internal quotation marks omitted)).

investigation "revealed that [the jail] failed to: take adequate measures to limit the introduction of contraband into the facilities; classify inmates appropriately based on their anticipated in-custody behavior; and supervise inmates adequately." The department said that "[s]uch failures significantly increase[d] the risk of violence, placing both inmates and staff at risk of serious harm" and that the "security, supervision, and protection from harm deficiencies at [the jail] were exacerbated by a lack of adequate policies, procedures, training, and staffing." Specifically, the department said that the jail "conducted too few shakedowns" and, as a result, "inmates possessed various shanks, razors, bleach, and other contraband."

The department also explained that "[a]dequate classification systems are a fundamental component of providing a reasonably safe environment in a corrections institution." "The primary goal of a classification system is to predict in-custody behavior so that appropriate security measures can be utilized to minimize the risk of violence." Yet, the department found that while the jail "collected various behavior-based information, this information was not utilized to classify inmates." As a result, the jail "failed to separate adequately predatory inmates from vulnerable inmates." The department noted that a "meaningful classification system is even more important in crowded facilities like [the jail]." The department found that the jail was "dangerously overcrowded." The department said that these "deficiencies

3

[it] identified in security administration at [the jail] stemmed in large part from a lack of adequate polices, procedures, training, and staffing."

To "address the constitutional deficiencies" it identified, the department recommended that the jail: "[d]evelop and implement an objective, behavior-based classification system that separates inmates in housing units by classification levels"; "[d]evelop and implement written procedures for conducting and documenting security inspections and inmate welfare checks"; "[p]rovide adequate corrections officer staffing and supervision to ensure inmate safety"; "[d]evelop and implement policies governing the conduct of shakedowns that increase the frequency and identify the scope of shakedowns in order to minimize inmates' access to dangerous contraband"; and "[d]evelop and implement policies requiring adequate documentation and investigation of . . . inmate-on-inmate violence."

The department's letter, according to Dickinson, put Sheriff Cochran and Warden Oliver "on notice regarding the inadequacy of [the jail's] classification system and an ongoing problem with inmate-on-inmate violence." Still, the complaint alleged, Sheriff Cochran and Warden Oliver did not implement policies to "identify[] and segregat[e] inmates known or likely to be perpetrators of assaults" and continued to "routinely house[] dangerous inmates in crowded conditions with non-violent inmates."

Sheriff Cochran and Warden Oliver were also aware that the jail's processing area was inadequate for processing and properly searching the number of inmates the jail received, but they took no alternative measures to limit contraband. Warden Oliver "admitted" in interviews with local news that there "was inadequate physical space for inmates being processed" at the jail and that he "was aware of up to seven inmates housed in a two-man jail cell." Despite Sheriff Cochran and Warden Oliver's knowledge of these issues, the complaint says they went unaddressed.

Following an argument with his aunt in January 2018, Dickinson was arrested for misdemeanor harassment and brought to the jail. Dickinson had no prior criminal history. He was placed into a cell with another man. On Dickinson's third day at the jail, police officers brought Joshua Brown to the jail. Brown had a long criminal history, including a murder conviction, which was noted in his jail record. When he arrived, Brown was in a "rage" and "out-of-control." He was fighting with the police officers and, when the police officers left, he continued to fight with corrections officers. The corrections officers knew Brown to be a "violent and difficult inmate" from his prior stints at the jail. Eventually, the corrections officers restrained Brown and "dragged" him into Dickinson's cell.

As Dickinson began to do pushups against the wall, he was immediately hit in the back of the head by Brown. Brown then pulled out a knife and stabbed

5

Dickinson multiple times. Dickinson lost consciousness and was taken to the University of South Alabama Hospital for treatment.

Dickinson brought section 1983 deliberate-indifference claims against Sheriff Cochran and Warden Oliver for 1) failure to protect him from being stabbed and 2) failure to staff the jail and train and supervise the corrections officers.[2] Sheriff Cochran and Warden Oliver moved to dismiss, arguing that they were entitled to qualified immunity. The district court denied the dismissal motion, and Sheriff Cochran and Warden Oliver appeal.

## STANDARD OF REVIEW

Although "the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be . . . raised and considered on a motion to dismiss." St. George v. Pinellas Cnty., 285 F.3d 1334, 1337 (11th Cir. 2002). "Generally speaking, it is proper to grant a motion to dismiss on qualified immunity grounds when the 'complaint fails to allege the violation of a clearly established constitutional right.'" Corbitt, 929 F.3d at 1311 (quoting St. George, 285 F.3d at 1337). We review this question of law "de novo, accepting the facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor,"

---

[2] Dickinson also brought deliberate-indifference claims against Mobile County and fourteen corrections officers for failure to protect him from being stabbed. The claims against the county and the corrections officers are not at issue in this appeal.

6

keeping in mind that we are "limited to the four corners of the complaint." St. George, 285 F.3d at 1337.

## DISCUSSION

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (citations and quotations omitted). "To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." Id. There is no dispute that running the jail was within Sheriff Cochran and Warden Oliver's discretionary duties, "so [Dickinson] bears the burden to show that [they were] not entitled to qualified immunity." Id. To do so, Dickinson must allege that Sheriff Cochran and Warden Oliver: 1) violated a constitutional right; and 2) that the right was clearly established at the time of the alleged violation. See id.

"Prison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners." Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014). But not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). "It is well settled

that prison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment [only] if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019) (citations and quotations omitted).[3]

A plaintiff must first allege "an objectively substantial risk of serious harm to prisoners." Harrison, 746 F.3d at 1298 (quoting Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1028–29 (11th Cir. 2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561–63 (2007)). Next, the plaintiff must allege that the jail official was deliberately indifferent, which requires the following: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Goodman v. Kimbrough, 718 F.3d 1325, 1331–32 (11th Cir. 2013) (quotations omitted).

But Sheriff Cochran and Warden Oliver are supervisors and "[i]t is well established in this Circuit that supervisory officials are not liable under [section] 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir.

---

[3] Because Dickinson was a detainee and not a prisoner, his "constitutional rights arise not from the Eighth Amendment, but from the Due Process Clause of the Fourteenth Amendment." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995) (citations and quotations omitted). Nevertheless, "we may properly analyze [his] claim under the Eighth Amendment, as certainly states may not impose on pretrial detainees conditions that would violate a convicted prisoner's [E]ighth [A]mendment rights[.]" Id. (citation and quotations omitted).

2003) (quotations omitted). "Therefore, a plaintiff seeking to hold a supervisor liable for constitutional violations must show that the supervisor either participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." Harrison, 746 F.3d at 1298.

Dickinson concedes that Sheriff Cochran and Warden Oliver did not personally participate in the unconstitutional conduct the day he was attacked. Instead, he argues that their failure as supervisors caused Brown's attack on him. There are three ways to establish a causal connection between a supervisor's actions and the unlawful conduct: 1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; 2) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights"; or 3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone, 326 F.3d at 1360 (citations and quotations omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (quotations omitted). This "standard by which a supervisor is held liable in his individual capacity for the

9

actions of a subordinate is extremely rigorous." Keith v. DeKalb Cnty., Ga., 749 F.3d 1034, 1048 (11th Cir. 2014) (alterations adopted and quotations omitted).

*Violation of a Constitutional Right*

Dickinson has sufficiently alleged that Sheriff Cochran and Warden Oliver knew about the history of widespread inmate-on-inmate abuse at the jail and failed to do anything about it. Specifically, Dickinson alleged that, since at least 2003 when the department began its investigation, Sheriff Cochran and Warden Oliver's jail: "routinely housed dangerous inmates in crowded conditions with non-violent inmates," allowed "the introduction of contraband" by improperly searching inmates, and inadequately supervised inmates. These practices, according to Dickinson, led to an ongoing problem with inmate-on-inmate violence and caused him—a nonviolent, first-time offender—to be stabbed after he was housed with Brown, a convicted murderer who was in a "rage" and "out-of-control" at the time he was brought to the jail.

Dickinson alleged that, despite knowing about the history at the jail, Sheriff Cochran and Warden Oliver acted with deliberate indifference by doing nothing to address the jail's conditions. According to Dickinson, Sheriff Cochran and Warden Oliver failed to implement a "proper classification system," "adequately train correctional officers regarding classification issues," "limit the introduction of

10

contraband" by training officers to properly search inmates, and train officers to adequately supervise inmates.

We have held that such allegations, if true, were sufficient to establish a supervisory official's deliberate indifference to an inmate's constitutional rights. For example, in Marsh, the plaintiff was attacked by another inmate and alleged that the jail had "no segregation of nonviolent inmates from violent inmates," corrections officers failed to adequately supervise inmates, contraband and weapons were "readily available," and "at times the [j]ail housed more prisoners than the cells could accommodate." 268 F.3d at 1021–22, 1029. The plaintiff alleged that the sheriff had received "[a] letter from prisoner-rights advocates" saying "that the [j]ail conditions posed 'an immediate and serious threat to the safety of the inmates' and made inmates 'highly vulnerable to assault by other inmates.'" Id. at 1025. Yet, the plaintiff alleged that the sheriff took "no measures . . . to improve conditions at the [j]ail." Id. at 1034. We held that these allegations established the sheriff's liability for her deliberate indifference to the plaintiff's constitutional rights because "it is an unreasonable response for an official to do nothing when confronted with prison conditions . . . that pose a risk of serious physical harm to inmates." Id.

And in Hale, the plaintiff had summary judgment evidence that the jail was overcrowded, inmates were inadequately supervised, and there was "no policy for classifying and segregating the inmates," causing "[the plaintiff], who was detained

11

for failure to appear, [to be] held with [an inmate] who was detained for murder and attempted murder." Hale, 50 F.3d at 1583–84. The evidence also showed that the sheriff "knew that inmate-on-inmate violence was occurring on a regular basis during . . . periods of overcrowding" but failed "to classify or segregate violent from non-violent inmates, . . . adequately train the jailers, and adequately supervise and monitor the inmates." Id. at 1583–85. We held that a jury could find an "excessive risk flowed from an atmosphere of deliberate indifference" and that the sheriff was liable for the plaintiff's beating by his cellmates. Id. 1584–85.

Sheriff Cochran and Warden Oliver argue it was the county's responsibility under Alabama law—not theirs—to maintain the jail. But Dickinson alleged that Sheriff Cochran and Warden Oliver were hired by the county to run the jail and they failed to correct the known problems of overcrowding, inmate classification, and contraband that caused inmate-on-inmate abuse. At this early stage in the litigation, we must accept Dickinson's allegations as true. See Corbitt, 929 F.3d at 1326 n.3 ("At [the motion to dismiss] stage, we must take plaintiff's allegations as true.").

*Clearly Established at the Time*

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The "salient question" is "whether the state of the law" at the time of the official's conduct gave

12

the official "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002). "[S]ince Hope," we have "identified three different ways a plaintiff can show that the state of the law gives officials fair warning of a clearly established right." Corbitt, 929 F.3d at 1312. First, a plaintiff can "show that a materially similar case has already been decided." Id. Second, a plaintiff can "show that a broader, clearly established principle should control the novel facts" of a particular situation. Id. Third, a plaintiff can show that his or her case "fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." Id. Dickinson argues that he has shown all three, but we need look no further than the first.

At least two materially similar cases have already been decided: Hale and Marsh. In Hale, a case we decided twenty-five years ago, the plaintiff brought deliberate indifference claims under section 1983 against the sheriff and the county after he was beaten by two cellmates. Hale, 50 F.3d at 1581. The plaintiff showed that "inmate-on-inmate violence occurred regularly when the jail was overcrowded," "the jail had no policy for classifying and segregating the inmates," the jail inadequately supervised inmates, and that the "plaintiff, who was detained for failure to appear, was held with [an inmate] who was detained for murder and attempted murder." Id. at 1583–84. The plaintiff argued that the sheriff was deliberately indifferent because he knew of the inmate-on-inmate violence but failed to

13

implement measures to address it, including a policy to "classify[] and segregat[e] the inmates based on their likelihood for violence[.]" Id. at 1583. We held that the evidence was sufficient for a jury to find that the sheriff, by failing to implement measures to address the violence, was deliberately indifferent to the inmate's right to be free of harm from other inmates. Id. at 1584–85.

Six years later, we confirmed en banc that Hale "clearly established in this Circuit that it is an unreasonable response for an official to do nothing when confronted with prison conditions—like the conditions alleged in [Hale]—that pose a risk of serious physical harm to inmates." See Marsh, 268 F.3d at 1034. In Marsh, the plaintiff was assaulted by another inmate and brought deliberate indifference claims against jail officials, including the sheriff. Id. at 1021–22. The plaintiff alleged he was held in a jail where "there was no segregation of nonviolent inmates from violent inmates," that "at times the [j]ail housed more prisoners than the cells could accommodate," that corrections officers did not adequately supervise prisoners, that contraband and weapons were "readily available," and that officials did nothing to address these issues. Id. at 1029. We held that these allegations, "if true," stated a claim for deliberate indifference. Id.

Sheriff Cochran and Warden Oliver had "fair warning" under Hale and Marsh that their alleged failure to correct the overcrowding, inmate classification, and contraband issues, which resulted in inmate-on-inmate abuse at the jail, violated a

14

clearly established constitutional right. Like the plaintiffs in those cases, Dickinson alleged that, when confronted with the jail's "ongoing problem with inmate-on-inmate violence," Sheriff Cochran and Warden Oliver failed to implement a "proper classification system," "adequately train correctional officers regarding classification issues," "limit the introduction of contraband" by training officers to properly search inmates, and train officers to adequately supervise inmates. These alleged failures resulted in deliberate indifference to Dickinson's clearly established Fourteenth Amendment rights. See Hale, 50 F.3d at 1584–85; Marsh, 268 F.3d at 1034; see also Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1321 (11th Cir. 2005) (noting that Hale and Marsh describe the type of jail conditions that "pose the substantial risk of serious harm necessary for a violation of the federal Constitution").

Sheriff Cochran and Warden Oliver argue that Marbury forecloses any reliance on Hale or Marsh because Marbury requires a plaintiff to show that he or she is confined to a prison "where violence and terror reign" and that "serious inmate-on-inmate violence [is] the norm or something close to it." But, as Marbury makes clear, its violence-is-the-norm standard applies where a plaintiff alleges only a generalized risk and points to no "specific features of a facility or its population rendering it particularly violent." Marbury, 936 F.3d at 1235 ("a generalized risk of violence from a prison population could support a claim of deliberate indifference

15

to a substantial risk of serious harm" where a "plaintiff has pointed to specific features of a facility or its population rendering it particularly violent").  In other words, Marbury says that if the only evidence of deliberate indifference to inmate-on-inmate abuse is that jail officials knew about a generalized risk of violence, without more, the evidence must show that the risk was so great it was something close to normalized violence or a reign of terror.  The plaintiff in Marbury produced no evidence of and "made no allegations regarding the specific features of the prison that would make it particularly violent."  Id.  But here, unlike the plaintiff in Marbury, Dickinson has alleged more than a generalized risk of violence.

Dickinson, like the plaintiffs in Hale and Marsh, has alleged specific features of the jail that render it particularly violent.  The plaintiff in Hale alleged overcrowding, failure to identify and segregate violent inmates, and failure to adequately supervise inmates.  See Hale, 50 F.3d at 1583–84.  The plaintiff in Marsh alleged overcrowding, failure to identify and segregate violent inmates, failure to limit contraband, and failure to adequately supervise inmates.  See Marsh, 268 F.3d at 1029.  Here, Dickinson alleged overcrowding, failure to identify and segregate violent inmates, failure to properly search inmates, failure to limit contraband, and failure to adequately supervise inmates.  But the plaintiff in Marbury did not allege any specific features of the facility that would render it particularly violent and therefore failed to show a constitutional violation.  See Marbury, 936 F.3d at 1235.

16

This case is "materially similar" to <u>Hale</u> and <u>Marsh</u>—not <u>Marbury</u>.  Sheriff Cochran and Warden Oliver had "fair warning" that their alleged failure to correct the known inmate-on-inmate abuse at the jail violated a clearly established constitutional right.

## CONCLUSION

It is early in the procedural life of this case.  Because Sheriff Cochran and Warden Oliver have appealed from the district court's order denying their motion to dismiss on qualified immunity grounds, all we have to go on are the allegations in Dickinson's complaint.  There has been no discovery and the parties haven't presented any evidence to the district court.  Dickinson may not be able to prove any of his allegations.  But for now, reviewing only the allegations in Dickinson's complaint, as we must, we affirm the district court's conclusion that the complaint sufficiently alleged a violation of Dickinson's clearly established constitutional rights.

**AFFIRMED.**

17